# LINCOLN GAS AND ELECTRIC LIGHT CO. *v.* CITY OF LINCOLN.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEBRASKA.

No. 83. Argued December 6, 7, 1911.—Decided February 19, 1912.

Every legislative rate case presents three questions of prime importance: reasonable value of the plant; probable effect of the reduced rate upon future net income; deductions from gross receipts as a fund to preserve plant from depreciation.

A legislative rate for a public service corporation is presumed to be sufficient to produce a fair return on the plant, and the burden of showing that it is confiscatory rests upon those attacking it.

A public service corporation is entitled to a fair return upon the fair value of the plant at the time of the inquiry as to reasonableness of rates imposed, *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439; but in this case not decided what such a rate would be on a gas and electric plant in Nebraska.

Where a legislative rate contest involves ascertainment by testimony of experts and auditors of valuation of plant, capitalization, gross receipts, net earnings, depreciation and other elements, the proper practice is to refer the case at the outset to a skilled master, upon whose report specific errors can be assigned and ruled upon. *Chicago, Milwaukee & St. Paul Railway* v. *Tompkins,* 176 U. S. 167.

What sum should be annually deducted from gross or net receipts of a public service corporation for depreciation and replacement and how it should be applied, are novel and grave problems, and, in the absence of a full report as to every element involved, this court is not justified in passing upon them.

The operation of an ordinance establishing a rate for gas will not be enjoined unless complainant enters into a bond to account to consumers for all overcharges in case the ordinance is eventually sustained.

THE facts, which involve the validity of an ordinance of the City of Lincoln, Nebraska, regulating charges for gas furnished to consumers, are stated in the opinion.

*Mr. Halleck F. Rose*, with whom *Mr. Charles A. Frueauff, Mr. Edmund C. Strobe* and *Mr. John F. Stout* were on the brief, for appellant:

Any deprivation of the right of a public utility company to a reasonable return upon the value of its property devoted to the public service, accomplished by legislative adoption of inadequate rates, is a deprivation of property without due process of law, and a confiscation thereof to the public use without just compensation, and a denial of the equal protection of the laws, in violation of the Fourteenth Amendment. *Chicago, M. & St. P. R. Co.* v. *Minnesota*, 134 U. S. 418; *Reagan* v. *Farmers' L. & T. Co.*, 154 U. S. 362; *Smyth* v. *Ames*, 169 U. S. 466; *San Diego L. & T. Co.* v. *National City*, 174 U. S. 739; *Chicago, M. & St. P. R. Co.* v. *Tompkins*, 176 U. S. 167; *Minneapolis & St. L. R. Co.* v. *Minnesota*, 186 U. S. 257; *Atlantic Coast Line* v. *North Carolina Corp. Com.*, 206 U. S. 1.

Appellant's case as made by the proofs, ought not to be prejudiced by the circumstances that it sought injunctive relief in the first instance, without submitting to the confiscatory rates. *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 40.

The inviolability of property, under the rule of the Constitution, prohibits establishment of gas rates in Lincoln, Nebraska, at a rate so low as to deprive the capital employed in that service of a smaller rate of earning than eight per cent. *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 40, 51; *State Journal Printing Co.* v. *Madison Gas & Electric Co.*, 4 Wis. R. C. R. 464.

As to what is a reasonable rate of net earnings, see *Water Co.* v. *Des Moines*, September 16, 1911, 192 Fed. Rep. 193; *Havelock* v. *Lincoln Traction Co.*, May 17, 1911 (see Report Nebraska State Railway Commission for 1911), both holding that where the rate of interest on fixed interest-bearing securities in any given locality is

five per cent., a maximum return to the investors in electric railways would not be unreasonable or excessive at eight per cent.

The prevailing rates of interest in the community where the enterprise is executed cannot be wholly ignored. While the court has not committed itself to the doctrine that earnings may not be reduced, in any case, below the legal rate, there is reason and authority for the contention that the fair return required by the Constitution must not be less than the legal rate of interest. *Brymer* v. *Butler Water Co.*, 179 Pa. St. 251; *Pa. R. Co.* v. *Philadelphia County*, 220 Pa. St. 115; *Chicago Union Traction Co.* v. *Board of Equalization*, 114 Fed. Rep. 561; *Louisville & N. R. Co.* v. *Brown*, 123 Fed. Rep. 951; *Central R. Co.* v. *R. Com.*, 161 Fed. Rep. 925; *Milwaukee Electric R. & L. Co.* v. *Milwaukee*, 87 Fed. Rep. 585; *Southern P. Co.* v. *Railroad Commissioners*, 78 Fed. Rep. 261; *People* v. *Tax Commissioner*, 12 N. Y. Supp. 392; *Spring Valley Water Works* v. *San Francisco*, 124 Fed. Rep. 598.

That appellant's stocks and bonds are in excess of the cost of the plant is shown not to have added to the cost of the service, nor increased the cost of operation and maintenance.

In practical operation, the gas service furnished by appellant is necessarily burdened with an annual depreciation charge, exceeding $20,000. Appellant is not compensated for this necessary cost of the service under the dollar rate; and the consequent burden upon appellant's general revenues, from this cause, was not accounted for in the opinion and decree of the Circuit Court.

Employment of the sinking fund method of computing depreciation, whereby the public appropriates the earnings accumulated at compound interest on each item of annual depreciation during the life term of the equipment, is neither lawful nor compatible with the system of valuing the whole property for revenue purposes at its depre-

ciated value. *Knoxville* v. *Knoxville Water Co.*, 212 U. S.
13; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 52.

The reduction of appellant's revenues by the municipal
regulations. adopted, and the occupation taxes levied, in
1906, was,. on its face, so radical and destructive, in view
of appellant's past experience, that appellant could not
accommodate its business thereto. Insolvency or resist-
ance of further rate reductions were its only alternatives.

The issue is whether the ordinance requiring the dollar
rate to become effective December 1, 1906, is valid; not
whether the lapse of time would develop conditions justify-
ing that rate at some future date, but whether its enforce-
ment at the time it was assailed by the bill and arrested
by injunction would have operated to confiscate the whole
or a part of appellant's fair and just capital earnings.

The valuation of $566,073.59 on which the Circuit
Court found appellant was entitled to a reasonable return,
is much less than the actual capital employed in its gas
service, as shown by the proofs.

There should be included in the valuation portion of
appellant's capital represented by the use of or interest
on money expended in construction of its plant during
the period of building, and until it was possible to put it
on some reasonable revenue basis to enable the plant to
carry its own interest or an equivalent capital earning
burden. The interest, or charge for use of the capital, is
incident to and a. part of the cost of construction. If not
allowed in the construction account, it is wholly lost to
the investor. *Brunswick District* v. *Maine Water Co.*,
99 Maine, 371; *Shepard* v. *Northern Pac. Ry. Co.*, 184
Fed. Rep. 809.

Some substantial sum should be allowed as a capital
investment for franchise rights, or "going value," or both.
The items of franchise and going value both represent
legitimate subjects for investment of the primary capital.
*Monongahela Nav. Co.* v. *United States*, 148 U. S. 311, 345;

*Waierworks* v. *Kansas City*, 62 Fed. Rep. 853; *Omaha* v. *Omaha Water Co.*, 218 U. S. 202.

If capital valuations be tested by actual experience in construction, or by the purchase price paid by the present owner, the sum stated in the opinion of the lower court must be greatly increased. *Smyth* v. *Ames*, 169 U. S. 546, 547.

The validity of that part of the decree which arrests the operation of the occupation tax ordinance, so far as questioned by the city on jurisdictional grounds, should be determined on this appeal.

*Mr. Fred C. Foster* and *Mr. W. M. Morning* for appellees:

The fixing of rates to be charged by public service corporations is a legislative act, whether the rate is fixed by direct act of the legislature, or by a subordinate body or board exercising delegated authority. *Knoxville* v. *Water Co.*, 212 U. S. 1; *McChord* v. *Louisville & N. R. Co.*, 183 U. S. 483; *Smyth* v. *Ames*, 169 U. S. 466; *Atlantic Coast Line* v. *Nor. Car. Corp. Com.*, 206 U. S. 1; *Saratoga Springs* v. *Saratoga Gas Co.*, 191 N. Y. 123; *Reagan* v. *Farmers' L. & T. Co.*, 154 U. S. 362, 395; *Knoxville* v. *Water Co.*, 212 U. S. 1; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19.

The rate fixed by this ordinance not having been put to a practical test, but having been suspended by this injunction, the ordinance will be upheld unless the case is one leaving no just or fair doubt that the rate, if enforced, would be confiscatory. Cases *supra*, and *San Diego Land Co.* v. *National City*, 174 U. S. 739; *San Diego Land Co.* v. *Jasper*, 189 U. S. 439. That is not this case.

In an investigation of the legality of maximum rates fixed by law, to be charged by public service corporations, two principal questions are to be considered: The present reasonable value of the property or plant devoted by the

corporation .to the public service; the net earnings probably arising under the new rate established. The new rate permits the net earnings of the corporation which would probably arise from the operation of its business after deducting necessary and reasonable charges and expenses to be a fair return upon the value of that which it employs for the public convenience. Cases *supra* and *Smyth* v. *Ames*, 169 U. S. 466; *Grain Shippers* v. *Railroad Co.*, 8 I. C. C. Rep. 158; *Steenerson* v. *Great Northern Ry. Co.*, 69 Minnesota, 353; *Danville* v. *Southern Ry. Co.*, 8 I. C. C. Rep. 409; *Redlands &c. Co.* v. *Redlands*, 121 California, 365; *American Asphalt Assn.* v. *Uintah Ry. Co.*, 13 I. C. C. Rep. 207.

In estimating the present reasonable value of appellant's property devoted to the public service in the operation of its gas business, from whatever standpoint it is discussed, it cannot exceed the amount found below.

It is the duty of a public service corporation to provide a reconstruction fund to take care of new construction and all permanent improvements, and these should not be charged to operating expenses. *Ill. Cent. R. Co.* v. *Int. Com. Comm.*, 206 U. S. 441; Wyman, Pub. Service Corp., § 1163.

Where items of this character have been paid for from current receipts and charged to operating expense, they should be excluded from consideration in estimating the value of the property upon which the company is entitled to earn dividends, or excluded from the operating expenses of a single year. *San Diego Water Co.* v. *San Diego*, 118 California, 556, 574; *Ill. Cent. R. Co.* v. *Interstate Commerce Com.*, 206 U. S. 441.

No part of a depreciation fund, accumulated by a public service corporation from its receipts, can be added to the capital upon which it is entitled to earn dividends, and where this has been done the burden is on the company to show to what extent it has been done, in order

that it may be segregated in a rate investigation. *Water Co.* v. *Knoxville, supra; Louisiana Railroad Comm.* v. *Cumberland T. & T. Co.,* 212 U. S. 414.

Capitalization affords no evidence of present value. *Knoxville* v. *Water Co.,* 212 U. S. 1; *Smyth* v. *Ames,* 169 U. S. 466; *San Diego Water Co.* v. *San Diego,* 118 California, 556; *Water Co.* v. *Redlands* (Cal.), 53 Pac. Rep. 843; *Southern Pac. Co.* v. *Bartine,* 170 Fed. Rep. 725, 751; *San Diego L. & T. Co.* v. *Jasper,* 189 U. S. 439.

The income of the year succeeding the passage of the ordinance is proper to be considered, even though the ordinance has not been put into effect. *Water Co.* v. *Knoxville,* 212 U. S. 1, 14.

The value of the franchise should not be included. *Willcox* v. *Gas Co.,* 212 U. S. 19, distinguished; Wyman on Public Service Corporations, § 1104.

In this case there is no evidence of franchise value.

Before a public service corporation can successfully attack a legislative rate as confiscatory, it must show that the effect of the operation of the rate will so reduce the earnings from its entire business as to deprive it of a reasonable return upon the value of its entire property used in the public service. *St. Louis R. R. Co.* v. *Gill,* 156 U. S. 649; *People ex rel.* v. *Alton Ry.,* 176 Illinois, 512; *Delaware St. Grange* v. *N. Y. Ry. Co.,* 3 I. C. C. Rep. 554; *Wilkesbarre* v. *Spring-Brook,* 4 Lack. Leg. News. 367; *Steenerson* v. *Great Northern,* 69 Minnesota, 353; *M. & S. R. Co.* v. *Minnesota,* 186 U. S. 257; *St. John* v. *Railway,* 22 Wallace, 136; *So. Pac. Ry.* v. *Railroad Co.,* 78 Fed. Rep. 236; *Atlantic Coast Line* v. *Nor. Car. Corp.,* 206 U. S. 1.

The burden of proof is on the corporation to show proper apportionment, and the right to segregate the two departments of the corporation (if it exists at all) so as to enable complainant to withdraw from this investigation all of the property and earnings of the electrical department, imposes the burden upon the company to make

full and detailed disclosure of the facts necessary to enable the court to intelligently determine that apportionment. *Grand Trunk Ry. Co.* v. *Wellman,* 143 U. S. 339, 345; *State* v. *Adams Express Co.* (Neb.), 122 N. W. Rep. 691; *Steenerson* v. *Great Northern,* 69 Minnesota, 353.

A sufficient showing must be made by a public service company when it assails a rate as confiscatory, that it cuts down its net income below the point of reasonable compensation. Cases *supra.*

In *Willcox* v. *Gas Co., supra,* this court recognized the strong probability that the earnings would increase under the reduced rate as a factor to be considered.

Rates may be unreasonable and yet not confiscatory. *Railroad Commission* v. *Cumberland T. & T. Co.,* 212 U. S. 414, 420; *San Diego Land Co.* v. *Jasper,* 189 U. S. 439; *Southern Pac.* v. *Bartine,* 170 Fed. Rep. 727.

The court will not concern itself with the matter of alleged discrimination between customers, nor as to whether the new rate might operate to require some customers to be carried at a loss, so long as the rate will yield a reasonable rate of return on the entire business. *Willcox* v. *Gas Co.,* 212 U. S. 19; *Nor. Pac. R. Co.* v. *North Dakota,* 216 U. S. 273; *St. Louis R. R. Co.* v. *Gill,* 156 U. S. 649; *People ex rel.* v. *Alton Ry.,* 176 Illinois, 512; and other cases, *supra.*

MR. JUSTICE LURTON delivered the opinion of the court.

This case involves the validity of an ordinance regulating the appellant's charges for gas furnished to consumers, and forbidding a charge in excess of one dollar per thousand feet. The bill assailed the rate as confiscatory, and, therefore, a taking of property without compensation. The ordinance rests upon legislative power to regulate the charges of such public service companies.

The sufficiency of the price prescribed to produce a fair profit upon the value of the property employed in the business is to be strongly presumed. The burden of showing its confiscatory character rests, therefore, upon the complaining company.

The court below, upon a final hearing, held that the appellant had not made out its case and dismissed the bill, with leave to renew the litigation, if, upon actual operation under the ordinance, the returns upon its business should not prove reasonably remunerative. The ordinance was never put in force. Within a few days after it went into effect this bill was filed and an injunction, *pendente lite*, granted, which was continued in force down to the final decree, and when this appeal was allowed, was, by order of the court allowing it, continued pending the appeal, under a bond conditioned to account for all over-charges if the ordinance should be sustained.

The case was not referred to a master, as is the usual course in such cases, although there was a great mass of conflicting evidence relating to the value of the plant, cost of operation and gross and net income. Neither did the court make specific findings of fact to which specific objection could be made. Such facts as may be said to constitute "findings of fact" appear in the way of large conclusions in the course of the opinion found in the record.

In this, as in every other legislative rate case, there are presented three questions of prime importance: First, the present reasonable value of the company's plant engaged in the regulated business; second, what will be the probable effect of the reduced rate upon the future net income from the property engaged in serving the public; and, third, in ascertaining the probable net income under the reduced rates prescribed, what deduction, if any, should be made from the gross receipts as a fund to preserve the property from future depreciation.

The valuation fixed by the court is the main point of attack. That the company is entitled to a fair return upon the value of the property at the time of the inquiry, is the rule. *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439, 442.

The court, as one means of finding the present value of the gas-making plant, found that the present cost of replacing it would be $566,073.59. The items which enter into this valuation, and the reason for reaching this result, as stated in the opinion, are shown by the paragraphs here set out:

"In determining for what amount the plant could be reconstructed, I have accepted in the main the testimony of complainant's witnesses as being the most satisfactory, and I find that the plant could be reconstructed for the following sums:

| | | |
|---|---:|---:|
| Coal gas apparatus. | $80,605 | 00 |
| Water gas apparatus. | 29,278 | 00 |
| Mains in dirt streets. | 90,578 | 00 |
| Mains in paved streets. | 130,027 | 00 |
| Gas services, etc. | 107,106 | 82 |
| Gas meters in use. | 36,282 | 90 |
| Meter connections. | 6,304 | 00 |
| Piping for gas ranges. | 16,500 | 00 |
| | $496,681 | 72 |
| Engineering expenses (2½%). | 12,417 | 04 |
| Real estate. | 4,000 | 00 |
| Present value of buildings. | 24,643 | 00 |
| Contingent expenses in construction | 25,000 | 00 |
| Cost of organizing company. | 3,000 | 00 |
| | $565,741 | 76 |

"While the evidence as to the depreciation is somewhat vague and indefinite, I think, upon the items ag-

gregating said $496,681.72, there should be deducted for depreciation 10 per cent, amounting to the sum of $49,668.17, making the total present valuation of the plant $516,073.59; but it is apparent that, for the successful and economical operation of the plant, a certain amount of working capital is required. This amount I find to be $50,000, making the total value of complainant's investment, upon which it is entitled to a reasonable return, $566,073.59.

"While it is true that the testimony shows that the complainant has not such working capital but has purchased upon credit the supplies necessary to operate, yet I think that, in determining what is a reasonable compensation, a working capital should be considered."

But the appellant does not accept the valuation thus fixed. It contends that there should be added to that the following:

| | |
|---|---:|
| Steam-boiler for water gas. . . . . . . . | $2,225 00 |
| Under-estimate of present value of buildings. . . . . . . . . . . . . . . . . . . . . . | 10,000 00 |
| Under-estimate of working capital. . | 10,000 00 |
| Under-estimate of meter connections | 6,102 00 |
| Under-estimate contingent expense of construction. . . . . . . . . . . . . . . | 37,500 00 |
| Interest on idle capital during construction. . . . . . . . . . . . . . . . . . . . . | 40,000 00 |
| Promotion of business, or going value and franchise, as elements in replacement value. . . . . . . . . . . . . . | 100,000 00 |
| | 205,852 00 |
| Add court's valuation. . . . . . . . . . . | 566,073 59 |
| | $771,925 59 |

The appellee, on the other hand, in support of the gen-

eral decree dismissing the bill, joins issue upon each of
these items, and insists that if the court shall see fit to
go into the evidence, it will find that the plant has been
greatly over-valued. It particularly objects to the large
item of $107,000 for gas service, and to the item of $50,000
added to the value of the property as "working capital,"
and says that the incorrectness of this is seen in the ad-
mission that the appellant has in fact no such working
capital engaged in the business. Appellee further con-
tends that the "expense of operation" in 1907 includes
reconstruction or replacement work, and that such items
enlarge the operating expenses of that year unduly and
correspondingly reduce the net income. If the expense
of operating the plant for that year is to be accepted as
the standard by which the operating expenses of future
years are to be estimated, the objection is serious if the
facts are as claimed.

The appellant further claims that the sum of $8,000
deducted from the net income, as a permanent protection
against future depreciation in the value of the plant,
is too small, and should be much larger. Upon this
there was conflicting expert testimony. Upon all of these
questions of valuation and of operating expense there is
much evidence, and much of it conflicting. The findings
of the court, as before stated, are of too comprehensive
a character to be of much help in dealing with the details
which are embraced.

But it is urged that even upon the valuation fixed by
the court the estimated future net income will be little
over five per cent., and, in consideration of the character
of the property and the high average interest rate pre-
vailing in Nebraska, this is not a reasonable or fair re-
turn and demonstrates the confiscatory character of the
ordinance. But if the $8,000 first deducted from the re-
ceipts and laid aside as a permanent fund to meet future
depreciation be taken into account, the estimated future

net income with the rate in force will exceed six per cent.

Nor did the Circuit Court hold that a net profit of five and two-tenths per cent. would be a fair and reasonable return upon the value of the property employed. What the court found was, in substance, that at least an income of that amount was certain, aside from the amount reserved for a permanent preservation fund. What the court said was this:

"While complainant, I think, is entitled to at least six per cent. upon the money invested, it does not appear that the reduced rate would not yield that sum. It is quite probable that the reduced rate would considerably increase the consumption of gas and thus increase the complainant's net profits.

"The record shows that in June, 1904, complainant voluntarily reduced its rates from approximately $1.50 per thousand to $1.20, and the amount of gas consumed, and net profits resulting, considerably increased. The inquiry in cases of this character is not alone what has complainant theretofore earned but it is what will be the effect of the ordinance reducing the rate upon the future net earnings of the company, and it devolves upon complainant to show not that the past rates have not produced a reasonable return but that the rate prescribed by the ordinance will not in future produce a reasonable return."

This case is full of difficult and grave questions. Such conclusions as to facts as are found in the court's opinion are not helpful when, as here, errors are assigned which open up substantially the whole case. The cause should have gone at the beginning to a skilled master, upon whose report specific errors could have been assigned and a ruling from the court obtained.

In the case of *Chicago, M. &c. Ry.* v. *Tompkins,* 176 U. S. 167, 179, 180, this court was called upon to review

a decree upholding a state-made railroad rate which had been unsuccessfully attacked as confiscatory. In that case, as in this, the matter had not been referred to a master, but had been decided by the Circuit Court upon the whole of the evidence. It came to this court upon such a variety of questions of fact and law as to practically open up the whole case. Impressed with the seriousness of the questions involved this court remanded the case for a reference and report by a skilled master. As to this practice, this court said:

"The question then arises what disposition of the case shall this court make. Ought we to examine the testimony, find the facts, and from those facts, deduce the proper conclusion?

"It would doubtless be within the competency of this court on an appeal in equity to do this, but we are constrained to think that it would not (particularly in a case like the present) be the proper course to pursue. This is an appellate court, and parties have a right to a determination of the facts in the first instance by the trial court. Doubtless if such determination is challenged on appeal it becomes our duty to examine the testimony and see if it sustains the findings, but if the facts found are not challenged by either party then this court need not go beyond its ordinary appellate duty of considering whether such facts justified the decree. We think this is one of those cases in which it is especially important that there should be a full and clear finding of the facts by the trial court. The questions are difficult, the interests are vast, and therefore the aid of the trial court should be had. . . . We are of opinion that a better practice is to refer the testimony to some competent master, to make all needed computations, and find fully the facts. It is hardly necessary to observe that in view of the difficulties and importance of such a case it is imperative that the most competent and reliable master, general

or special, should be selected, for it is not a light matter to interfere with the legislation of a State in respect to the prescribing of rates, nor a light matter to permit such legislation to wreck large property interests."

The question as to what sum, if any, upon the facts of this case should be annually deducted from the net income as a permanent maintenance or replacement fund, is novel and presents a grave problem.

Conflicting expert evidence has been introduced presenting radically different theories as to the necessity, character and amount of such a fund, and as to how it should be created, preserved and expended. Some of this evidence puts the sum to be annually deducted and set aside as a permanent fund at five per cent. upon the value of the plant at the time of deduction. It is obvious that if this view is sound there will be little or nothing of the net income left for distribution among shareholders, and no basis for legislative rate reduction now, and none likely until such time as the income from the permanent fund will keep up the plant. The work of reconstructing and replacing old parts by new in a plant of this kind must, in the very nature of things, be going on constantly. Heretofore it seems to have been so well and continuously done that the value of the plant as a whole has suffered less than one per cent. per annum if the total depreciation be distributed through the more than thirty years of operation. So far as can be now seen, reconstruction and replacement charges have, up to the present time, been borne by current revenue, with the result that the revenue remaining in the single year of 1907 showed a net surplus of $73,851.83, a sum large enough, if distributed to shareholders upon the basis of the value of property engaged in the business as claimed by appellant, to have paid a dividend of ten per cent., and about fifteen per cent. upon the valuation settled by the Circuit Court.

There is no finding as to the extent of the application

of the revenue of 1907 to reconstruction or replacement, as distinguished from current repairs and operating expenses. It is, however, plainly inferable that the revenue of that year was used to the extent necessary. If, in the past, reconstruction and replacement charges have been met out of current expenses, the fact must be taken into consideration, both when we come to estimating future net income and in determining what sum shall be annually set aside to guard against future depreciation. This doubtless influenced the court below in settling upon the amount of $8,000 as a sufficient annual appropriation of income as insurance against future depreciation. But if the constantly recurring necessity to do reconstruction or replacement work was in 1907 met out of the current income of that year, thereby diminishing the net income, the fact should be given weight in estimating future net income; otherwise there will be a double deduction on that account, first, by paying such charges as they occur, and thereafter by a contribution out of the remaining income for the same object.

The facts found are not full enough to at all justify this court in dealing with this problem of a replacement fund.

There should be a full report upon past depreciation, past expense for reconstruction or replacement, and past operating expenses, including current repairs. We should be advised as to the gross receipts for recent years, and just how these receipts have been expended. Then the amount to be set aside for future depreciation will depend upon the character and probable life of the property and the method adopted in the past to preserve the property. It can be readily seen that the amount to be annually set aside may be such as to forbid rate reductions because of the requirement of such a fund. The matter is one first for a skilled master, who should make a full report upon the value of the property, the receipts and the expenses of operation and the sums paid out on re-

construction and replacements, and in dividends in recent years.

For the reasons indicated, we direct that the decree be *Reversed, and the cause remanded to the District Court to refer the case to a competent and skilled master, to report fully his findings upon all of the questions raised by either party, separately, and with leave to both parties to take any additional evidence they may wish within a time to be fixed by the court, and that that court upon such report proceed as equity shall require. It is further ordered for the protection of all parties that the injunction granted in the court below continue in force until final decree there, upon condition that the appellant enter into a new bond, with sureties satisfactory to the court below, to account for all overcharges to consumers since the original restraining order in the event the ordinance shall be sustained, and that if such bond be not made within twenty days after the filing of the mandate that the injunction stand dissolved.*