**DYER et al.**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

Nos. 36–40, Dockets 22677–22681.

United States Court of Appeals Second Circuit.

Argued Feb. 2, 1954.

Decided March 9, 1954.

Clark, Circuit Judge, dissented.

These are appeals, involving income taxes, from five decisions of the Tax Court which were consolidated for trial as well as for decision by this court. On the basis of a stipulation, depositions, exhibits and oral testimony, the Tax Court, per Judge Van Fossan, made the following findings:

"B. W. Dyer & Company is a partnership (hereinafter referred to as the Partnership) engaged in business as sugar brokers and economists in New York, New York. The Partnership filed an income tax return on the cash receipts and disbursements basis for the calendar year 1944 with the collector of internal revenue for the second district of New York. Petitioners B. Wheeler Dyer, Ruth W. Dyer, Benjamin W. Dyer, Jr., and Daniel L. Dyer were members of the Partnership. Benjamin W. Dyer, Jr., was in the Armed Services and during 1944, was stationed in the European theatre of operations. The partners each filed income tax returns for the calendar year 1944 on the cash receipts and disbursements basis with the collector of internal revenue for the second district of New York. Petitioner Leonard Francis Daidone became a limited partner of the Partnership in June 1943. William Harry Vanderveer was an employee of the Partnership during 1944. The latter petitioners also filed income tax returns for the year 1944 on the cash receipts and disbursements basis with the collector of internal revenue for the second district of New York.

"On February 5, 1944, the Office of Price Administration issued a Revised Ration Order allowing the use of imported sugar-containing products without the surrender of ration stamps or certificates if the products were in the United States and in the possession of or in transit to the user on May 1, 1944. On February 21, 1944, an agreement was entered into between one A. I. Kaplan and the five members of the Partnership by which it was agreed that the parties, in a joint venture, would purchase sugar syrup in Cuba and import it into this country after flavoring it. The syrup

would then be sold. The agreement provided that net profits or losses from the venture were to be divided 50 per cent to Kaplan and 50 per cent to the partners. The project was to be financed equally by the partners and Kaplan. The agreement also provided for 'all risk' (including marine and war risk) insurance to be obtained by Kaplan on ocean transportation, as well as insurance against all risks, except deterioration while in storage in the United States. The insurance valuation was to be 80 cents per gallon and the Partnership and Kaplan were to be co-insured.

"Petitioner Daniel L. Dyer had resigned prior to February 1, 1943, from employment with the War Production Board, where he had served as an Assistant Administrator in the Sugar Branch. While employed in this capacity he had been loaned for a period of time by the War Production Board to the Office of Price Administration. He had become thoroughly familiar with the sugar and syrup policies of various Government Departments.

"On March 1, 1944, an agreement was entered into between Refined Syrups & Sugars, Inc., as sellers, and Kaplan and the partners, as buyers. The contract covered the purchase of approximately 675,000 gallons of Cuba invert sugar syrup at a price of $2.85 per 100 pounds of total sugar solids contained in the syrup.

"On or about March 3, 1944, letters were sent by B. W. Dyer & Company to Yvonne L. Dyer, wife of petitioner Daniel L. Dyer; Harriette W. Price, half sister of petitioner Ruth W. Dyer; Deborah S. Dyer, wife of petitioner Benjamin W. Dyer, Jr.; and Viola W. Hollriegel, an employee of the Partnership, offering each of them a 5 per cent interest in the venture. A 10 per cent interest was offered to Dorothy H. Daidone, wife of petitioner Leonard F. Daidone, and to Laura E. Vanderveer, wife of petitioner William H. Vanderveer. All of these offers were accepted. A. I. Kaplan had consented to this division of the Partnership's interest in the venture.

The offers stated that the risks existed in the undertaking but that the Partnership would do all within its power to minimize the risks. The offers also stated that the Partnership sought to reduce its risks by offering interests in the venture to others. None of the women read the agreements concerning the purchase of the syrup nor were they familiar with the details of the venture. No consideration was paid by the several women for the shares or interests assigned to them.

"Three of the women maintained trading accounts with the Partnership. The women who accepted interests in the undertaking discussed the venture with members of the Partnership and their families. Three of the women were also stockholders of the Dyer Sugar Corporation, through which the Partnership handled merchandise transactions. The officers and directors of this corporation were the members of the Partnership.

"On or about May 9, 1944, the Partnership mailed or delivered letters to Harriette W. Price, Deborah S. Dyer, Yvonne L. Dyer, Dorothy H. Daidone, Laura E. Vanderveer and Viola W. Hollriegel offering to distribute 90 per cent of the women's share of the profits realized. Each offer was accepted. The remaining 10 per cent retained by the Partnership was to be payment for the assumption of all outstanding risks by the Partnership.

"None of the aforementioned women rendered any services to the venture nor did they contribute money or pledge any assets as security for their participation in any losses that might have occurred. They understood that they took a risk in accepting the interests. The women (each) had personal assets and joint and individual bank accounts sufficient to cover estimated losses of $5,000. Except for joint bank accounts with her husband, Laura E. Vanderveer possessed only personal property, such as clothing and jewelry. The wives and half-sister of the petitioners did not share with the petitioners the profits distributed to them.

"At the time of the agreement of February 21, 1944, an offer to sell the syrup to the Pepsi-Cola Company was being considered. This proposed sale was not consummated but agreements were reached in March, 1944, to sell 350,000 gallons of vanillin flavored sugar syrup to the General Foods Corporation through the Dyer Sugar Corporation. Under the terms of the agreement the seller was not to be liable if the syrup failed to arrive by reason of act of God, war conditions, government, state or municipality regulation or action, embargo, fire, flood, accident or strike or transportation difficulty or any cause beyond the seller's control. Other similar agreements were entered into to sell 65,000 gallons of syrup to the Hoffman Beverage Company, 75,000 gallons to the Charles E. Hires Company, and 15,000 gallons to the Galler Beverages, Inc. All of the sugar syrup arrived in New York on April 18, 1944, and was sold forthwith as an unrationed sugar product.

"The venture was closed out on the books of the Partnership showing a total profit of $186,875.05. Profits were distributed on May 14, 1944, as follows:

"Dorothy H. Daidone.........$9,075.11
"Laura E. Vanderveer........ 9,075.11
"Yvonne L. Dyer............ 4,537.56
"Deborah S. Dyer............ 4,537.56
"Harriette W. Price.......... 4,537.56
"Viola W. Hollriegel ......... 4,537.56

"Each of the aforementioned persons reported the specified amount upon her individual income tax return for 1944. The respondent allocated the income received by these persons, as follows:

"Dorothy H. Daidone, to her husband, Leonard F. Daidone; Laura E. Vanderveer, to her husband, William H. Vanderveer; Deborah S. Dyer, to her husband, Benjamin W. Dyer, Jr.; Yvonne L. Dyer, to her husband, Daniel L. Dyer; Harriette W. Price, to her half sister, Ruth W. Dyer. The share of the profits distributed to Viola W. Hollriegel was not allocated to any one else and is not in issue in these proceedings."

The judge's opinion reads as follows:

"Van Fossan, Judge: The sole question to be determined, following the stipulation and concession of other issues, is whether the petitioners should be taxed upon the shares of profits derived from the venture which were distributed to the several women.

"The venture was a joint undertaking by A. I. Kaplan and the Partnership for the importation and sale of sugar syrup to be sold and used in this country ration-free at a time when sugar was rationed. Because of the likelihood of prospective consumer demand for unrationed sugar syrup the parties to the joint venture hoped for sizeable profits. On February 4, 1944, the Office of Price Administration specified the conditions under which imported sugar-containing products could be used ration-free. The products had to be in this country and in possession of, or in transit to, the user on May 1, 1944. The Partnership and Kaplan agreed on February 21, 1944, upon the terms of the joint venture to import sugar syrup from Cuba. On March 1, 1944, Kaplan and the Partnership contracted to buy 675,000 gallons of Cuban invert sugar syrup. On March 3, 1944, offers to share in the venture were tendered to the wives of three of the partners, the half sister of another partner, the wife of an employee, and also to another employee. These offers were accepted but nothing was paid for the interests received. The recipients of the interests did not advance cash or security, nor did they render services to the venture. By the terms of the letter of offer, they undertook to share in the profits or losses of the undertaking according to their percentage interest. Profits were realized and distributed according to a later agreement.

"The petitioners contend that the share of profits distributed to the women are taxable to them because they participated in the speculative venture by assuming part of the risks of the undertaking. No claim is made that the wives or half sister became members of the Partnership. It is petitioners' position that the women committed themselves

to the financial risks involved and that, by reason of this participation, they are taxable upon the share of profits distributed to them. Respondent denies that the women were participants in the joint venture and for that reason allocates the profits to the petitioners.

"On the facts here present and under well-established law, the transactions by which the petitioners sought to minimize their business losses by assigning a share of the profits to the several women were wholly ineffective to divert taxability of the profits from those who earned the income. Under Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, and Burnet v. Leininger, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665, petitioners are taxable on all of the profits. Cf. Richter v. Commissioner of Internal Revenue, 4 T.C. 271. In no sense can it be said that the women earned the income in question. They paid nothing, contributed nothing, earned nothing. They were merely the passive recipients of a share of the profits earned by the real participants in the joint venture. See also Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S. Ct. 1210, 93 L.Ed. 1659."

Before CLARK, FRANK and HINCKS, Circuit Judges.

Alger B. Chapman, Brady O. Bryson, Walter W. Walsh, Arthur K. Mason and David S. Smith, New York City, for petitioners.

H. Brian Holland, Ellis N. Slack, A. F. Prescott and I. Henry Kutz, Washington, D. C., for respondent.

FRANK, Circuit Judge.

Lucas v. Earl [1] plus Burnet v. Leininger [2] plus Helvering v. Clifford [3] and Helvering v. Horst,[4] as viewed by many judges who decided family-partnership cases [5] in the light of Commissioner of Internal Revenue v. Tower [6] and Lusthaus v. Commissioner of Internal Revenue,[7] added up to the sort of conclusion that would have defeated the taxpayers here. But judicial arithmetic, especially in tax matters, can be tricky, as some "inferior" judges learned [8] when they read the subsequent unanimous opinion in Commissioner of Internal Revenue v. Culbertson.[9] This court, after so reading, said, in Slifka v. Commissioner of Internal Revenue, 2 Cir., 182 F.2d 345, 346, that the test in cases such as this is "whether an association, or joint venture, which satisfies all formal requirements and may be valid as between the parties, has been created to promote the conduct of their business in any other way than by reducing taxes. That this makes motive a test of tax liability is true enough;[10] but it is equally true that it makes it so only when the reduction of taxes is the sole motive. That does not mean that 'business' may not be so conducted as best to keep down taxes; but it does mean that keeping down taxes is not of itself 'business'." With Culbertson in mind, this court again in Levin v. Commissioner of Internal Revenue, 2 Cir., 199 F.2d 692, remanded to the Tax Court, for further findings, a case in which that court had held against the taxpayer on the erroneous assumption that, absent active participation in

1. 1930, 281 U.S. 111, 50 S.Ct. 241, 74 L. Ed. 731.

2. 1931, 285 U.S. 136, 52 S.Ct. 345, 76 L. Ed. 665.

3. 1940, 309 U.S. 331, 60 S.Ct. 554, 84 L. Ed. 788.

4. 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L. Ed. 75.

5. By statutory definition—see Section 3797, 26 U.S.C.A.—"partnership" includes a "joint venture."
   See Sommers v. Commissioner of Internal Revenue, 2 Cir., 195 F.2d 680, 681, as to a "sub-venture."

6. 1946, 327 U.S. 280, 66 S.Ct. 532, 90 L. Ed. 670.

7. 1946, 327 U.S. 293, 66 S.Ct. 539, 90 L. Ed. 679.

8. See cases cited in concurring opinion in Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733 at page 753 note 2, 69 S.Ct. 1210, 93 L.Ed. 1659.

9. 1949, 337 U.S. 733, 69 S.Ct. 1210.

10. See 337 U.S. 733 at pages 743 note 12, and 744 note 13, 69 S.Ct. 1210.

the business, there could be no partnership taxwise.

Those decisions of our court, together with Sommers v. Commissioner of Internal Revenue, 2 Cir., 195 F.2d 680, serve as our guides here. For Judge Van Fossan rested his basic conclusion— i. e., that the "women" did not "earn the income"—on his determination that, under the contracts, they "contributed nothing." We consider that determination mistaken, for these reasons:

*As between the partnership and these women,* the contracts legally obligated each of the women to bear a risk of loss up to $5,000. There is evidence (1) that each had enough assets to meet such a liability and (2) that, when they executed the contracts, a real and substantial risk of loss existed;[11] and the judge found nothing to the contrary. Thus, under "local law," as between the women and the partnership, the women and the partnership became parties to a new, separate and distinct arrangement known as a "joint venture." That venture concerned not many future enterprises but only the sale of a limited quantity of sugar syrup; consequently, it was by its nature to have a short duration; and its chief element was a commitment to a considerable financial risk, since it called for little capital or skill in its operations. True, the partnership, in addition to its sharing in the risk, contributed some necessary capital for a brief interval, and it performed some slight necessary services. But,

bearing in mind that the partnership did not contribute to the joint venture its compensation for its selling services,[12] those facts do not negative the important fact that the women, under their contracts, assumed a part of that financial hazard which constituted the major factor in the joint undertaking. It follows that—if one does not peer behind the contracts—these women did contribute something substantial.

It will not do to say that such a contribution must invariably take the form of tangible property; for, under Culbertson, an intangible—such as a promissory note, an endorsement of a note, a guaranty, or an indemnity against loss— will suffice.[13] Significantly, the Commissioner so recognized in not seeking to deny the reality of the contribution of Viola Hollriegel, an employee of the old partnership who was in no way related to any of the partners. Indeed, the Commissioner's attitude toward taxability to her of her share of the profits goes to show that, if the other women similarly had had no familial ties to any of the partners, the profits allotted to those women could not have been treated as anything but part of their taxable incomes, respectively. So that the crucial question comes to this: Where there were family relationships, are the contracts to be deemed tax-evading devices?

As one shifts from a non-tax to a tax "universe of discourse," "reality" often becomes a "sham," a "subterfuge," or "a camouflage";[14] cream is regarded as

11. Among the uninsured risks, according to the evidence, were the following: (1) The OPA order of February 5, 1944 might be illegal or might be revoked, or the cut-off date (named in the order) advanced. (2) Because of the submarine war then occurring, ocean transportation might be unavailable or the syrup might not be delivered to a purchaser by the cut-off date. (3) The syrup might become contaminated in transit.

12. The accepted offer from the partnership to each of the women contained the following: "We also wish to point out that you will have no interest in the five percent (5%) selling commission which is paid to us as an expense by the joint ac-

count between Kaplan and ourselves. We are to continue to receive this and it will be considered as an expense in any share of this venture that you may assume."

13. In Culbertson, the taxpayer's sons contributed through promissory notes.

14. See Kocin v. United States, 2 Cir., 187 F.2d 707, 708: "For the partnership served no business purpose. In keeping with the decisions, it could be called a 'sham,' a 'disguise,' a 'masquerade,' a 'fiction,' a 'subterfuge,' a 'make-believe,' a 'mere pretense,' a 'mask,' a 'screen,' a 'veil,' an 'artifice,' a 'ruse,' or other names, supplied by the dictionary, which indicate that it does not succeed as an insulator * * * from tax liability."

skim milk masquerading; a giant shows up as a windmill.[15] On that account, in the context of "tax law," with its distinctive perspective, frequently depriving men's acts of the accent of reality, many husband-wife arrangements justify raised eyebrows. But the Culbertson case (as we have interpreted it in our decisions above cited) teaches that such skepticism will not transform a family partnership or joint venture, legally valid in other contexts, into a legal sham vis a vis taxes, unless the Tax Court, considering the entire situation, makes an explicit finding of a lack of "good faith."

The government insists that Burnet v. Leininger, 1931, 285 U.S. 136, 52 S.Ct. 345, 346, 76 L.Ed. 665, must control the decision here. We do not agree. There the taxpayer entered into a contract with his wife purporting to constitute her his equal "partner" in his interest in an active partnership of which he had been a member for the 22 previous years, and she agreed to assume liability for one-half the losses he might bear as a member of that existing partnership. His other partners did not consent to this arrangement, and no recognition of her status appeared on the books of the 22-year-old partnership which continued to pay the husband the same percentage of profits as theretofore and made no payments to the wife. The wife contributed nothing whatever to the previous partnership and took no part in the conduct of its business; there was created no new, separate, joint venture between husband and wife; there was never any formal accounting between them. On these facts, the Supreme Court sustained the Board of Tax Appeals which had held the husband taxable on the whole of the income earned as his share of the old partnership. The Supreme Court said: "Upon the facts as found, the agreement with Mrs. Leininger cannot be taken to have amounted to more than an equitable assignment of one-half of what her husband should receive from the partnership, she in turn agreeing to make good to him one-half of the losses he might sustain by reason of his membership in the firm. * * * (The) right of the wife was derived from the agreement with her husband and rested upon the distributive share which he had, and continued to have, as a member of the partnership." Notably, had the husband incurred a loss, he alone could have held his wife liable, whereas in the case at bar, the obligation of each woman ran not to her husband alone but to the partnership. Moreover, here the heart of

15. See Grant v. Commissioner of Internal Revenue, 2 Cir., 1953, 209 F.2d 430, 434: "[J]ust as elsewhere the meaning of a fact—indeed what is a fact—often varies with the purpose in hand—e.g., a hammer is not the same fact to a carpenter, a painter, a physicist and a murderer—so in the legal realm what is a fact often depends on the special legal context in which the question arises. More particularly, in applying tax statutes, the Supreme Court frequently turns away from the interpretations of conduct under 'local' or 'private law,' and remarks that it is 'speaking with reference to taxation' or dealing with an event 'for tax purposes.' When, in tax cases, the Court says that, because 'taxation * * * is eminently practical,' it regards 'substance' rather than 'form,' or looks through a 'sham' or 'disguise' or 'masquerade' to the 'realities,' it is saying, in effect, that it treats as mere 'form' or as a 'sham' that which in a different legal setting represents 'substance' or 'reality.' For thinking in the domain of 'tax law' is necessarily contextual. It operates in a specialized 'universe of discourse.' Any such specialized talk-world (or think-world) has its own restricted 'attentional attitudes,' and confers the accent of reality on some matters (and the accent of unreality upon others) whereas in another alternative talk-world (that of decedent's estates for example) some of the reals of the 'tax-law' world become unreals, ghosts or phantoms. Consequently, we think that the ordinary rules, relative to private rights and duties growing out of the facts of a particular contract, must give way to the paramount aim of the revenue statute before us here. See, e.g., Lucas v. Earl, 281 U.S. 111, 114, 50 S.Ct. 241, 74 L.Ed. 731, where the Court (per Holmes, J.), when applying a section of the Revenue Act, disregarded the legal consequences of a contract under state 'law.' "

the specific joint venture was the taking of risk of loss in which the women shared; there was no like fact in the Leininger case, nor there did the evidence show that the wife was financially able to make good any loss, i. e., that she gave any collectible obligation as consideration for the assignment to her. Cf. Rupple v. Kuhl, 7 Cir., 177 F.2d 823, 826. Finally, and above all, the Supreme Court had not yet required, as it later did in Culbertson, that there be an explicit finding, as a fact,[16] of lack of good faith intention before an apparently valid joint venture agreement could be ignored.

The judge here made no such finding. Had he done so, basing it on all the elements of the situation (including, among other things, the fact that the women had not read the contracts they signed) and resting his finding in part on a testimonial inference resulting from his observation of the demeanor [17] of the witnesses who testified orally, we would have affirmed.

■ As it is, we think we must not infer such an implied finding nor contrive an express one of our own. If this case had arisen before Culbertson's advent, we might have done one or the other. For we might have surmised that, had there been losses, the women never would have been asked to live up to their obligations, and that the contracts served solely as paper covers for a tax-reducing scheme benefitting the partnership's members. But we live in the post-Culbertson era and have noted the warning that the ordinary judicial eyes have not the "gimlet" quality, possessed by the Tax Court only, to "pierce" the family-partnership "guise" and thus to differentiate "between the real thing and the imitation".[18] Some commentators have criticized Culbertson as requiring sheer ritualism of the Tax Court. But we have not the privilege of criticism: We must obey a Supreme Court decision.

■ Even so, we need not and shall not here close the door to Tax Court compliance with the Culbertson requirement. "In order that injustice may not be done"[19] to the government, and following the practice, particularly in a case of this type, adopted by the Supreme Court (and by us [20]), we reverse

---

16. The Culbertson case tells us that the question of bona fide intention is one of fact. But it is the kind of fact which is seldom a "testimonial inference"; usually it is a "derivative inference." See, e.g., American Tobacco Co. v. Katingo Hadjipatera, 2 Cir., 194 F.2d 449, 451; E. F. Drew & Co. v. Reinhard, 2 Cir., 170 F.2d 679, 684; 5 Moore, Federal Practice (2d ed.) p. 2615.

17. See the preceding footnote.

18. Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 737, 749, 753, 69 S.Ct. 1210, 1219, 93 L.Ed. 1659 (concurring opinion).

19. See Ford Motor Co. v. N. L. R. B., 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221; Hormel v. Helvering, 312 U.S. 552, 560, 61 S.Ct. 719, 85 L.Ed. 1037; Estho v. Lear, 7 Pet. 130, 8 L.Ed. 632; Armstrong v. Lear, 8 Pet. 52, 74, 8 L.Ed. 863; Chicago, M. & St. P. R. Co. v. Tompkins, 176 U.S. 167, 180, 20 S.Ct. 336, 44 L.Ed. 417; United States v. Rio Grande Dam & Irrigation Co., 184 U.S. 416, 424; Lincoln Gas & Electric Light Co. v. City of Lincoln, 223 U.S. 349, 361–365, 32 S. Ct. 271, 56 L.Ed. 466; Security Mortgage Co. v. Powers, 278 U.S. 149, 159–160, 49 S.Ct. 84, 73 L.Ed. 236; Railroad Commission of Wis. v. Maxcy, 281 U.S. 82, 50 S.Ct. 228, 74 L.Ed. 717; Interstate Circuit, Inc. v. United States, 304 U.S. 55, 58 S.Ct. 768, 82 L.Ed. 1146; Levesque v. F. H. McGraw & Co., 2 Cir., 165 F.2d 585, 587; Porter v. Leventhal, 2 Cir., 160 F.2d 52; Kreste v. United States, 2 Cir., 158 F.2d 575, 580; Nachman Spring-Filled Corp. v. Kay Manufacturing Co., 2 Cir., 139 F.2d 781, 787; Zalkind v. Scheinman, 2 Cir., 139 F.2d 895, 904; Phelan v. Middle States Oil Corp., 2 Cir., 154 F.2d 978, 1000; Benz v. Celeste Fur Dyeing & Dressing Corp., 2 Cir., 136 F.2d 845, 848; Wyant v. Caldwell, 4 Cir., 67 F.2d 374; Columbus Gas & Fuel Co. v. City of Columbus, 6 Cir., 55 F.2d 56, 58; Pfeil v. Jamison, 3 Cir., 245 F. 119.

20. See Levin v. Commissioner of Internal Revenue, 2 Cir., 199 F.2d 692; cf. Sommers v. Commissioner of Internal Revenue, 2 Cir., 195 F.2d 680.

and remand for the purpose of permitting the judge, if he believes the evidence so warrants, to make a further finding relative to the issue of good faith.

Reversed and remanded.

CLARK, Circuit Judge (dissenting).

Judge Van Fossan's findings and conclusions, strongly buttressed by the evidence, in my view not only justify, but require, affirmance here. The scheme disclosed is in all salient essentials that of Burnet v. Leininger, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665, and should receive the same treatment taxwise. I do not understand that case to have been overruled by C. I. R. v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659, nor do I see any close application of Culbertson principles required or appropriate here. The Supreme Court there, in stressing the necessity of determinations of fact as to the nature of the partnership before it, simply emphasized that an actual working partnership which carried on business to produce income was not to be denied the tax status of a partnership merely because the individual members were also members of a family. Here the wives are not even claimed to be members of the income-producing partnership. They received only assignments from partners —usually their husbands, in one case a sister—of a percentage of potential profits under agreements of sub-"venture" of such formality that they did not even bother to read the solemnly prepared documents. To the actual partnership and to the production of its income, they contributed nothing—neither services, nor expertise or business know-how, nor capital. All this is of course conceded. But the contention for exemption of the assigned shares of partnership income from taxation to the partners is based upon assumption of some of the partners' risks. Even as to this there is very little of actuality. Their named risk (up to $5,000) was small in terms of the total adventure; actual loss, as distinguished from merely diminished profits, was unlikely; and it does strain credulity to believe that the husbands, the benefactors of the wives initially, would have lacked like generosity had the time ever arisen for enforcement of the portentously stated, though limited, obligations. But be that as it may, I believe that on the basis of the fully conceded facts the partners who produced the income must pay the tax upon it before it passes to other hands. Burnet v. Leininger, supra; Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; and the other Supreme Court cases cited in the opinion.

To appreciate how deeply we have become mired in semantic difficulties, one should consider the nature of the finding which the Tax Court is now called upon to make. Since the ladies had not even read their agreements and thus had no "faith"—either "good," "bad," or otherwise—as to them, I do not apprehend that Judge Van Fossan will encounter particular difficulty in finding the lack of good faith for which my brothers are looking. But I do dislike the dumping of this unanalyzed and potentially misleading concept on the judge's desk without more attempt to disclose what it means. In the Culbertson context, as we have seen, the question whether the members of a family are actually acting in good faith in the partnership relation to produce the taxable income has meaning and significance. Here, whatever the concept may mean, it cannot, from the nature of things, have a like correspondence with business reality. We know the steps the parties took and what happened. So what can "good faith" mean more than that the parties knew and intended to do what they did? That they may actually have known either less law or more law than appears on the surface surely cannot give them either greater or less tax immunity. Even the one matter of possible doubt indicated above—how far the ladies might really have to dig into their savings, or husbands' benefactions, in the unlikely event of loss—sets no problem; for a commitment of this supplementary

and limited character, under the authorities cited, does not free partnership income from taxation to the partners, whatever the high-sounding titles of venture or subventure given to the situation. Thus the stress in all the opinions in the Culbertson case to discover whether there was a "real" or a "true" partnership, or a "genuine union for partnership business purposes," or an arrangement putting all involved "in the same business boat" becomes quite meaningless when the attempt is made to transfer the search for actual intent to the present circumstances. Obviously these ladies were never in the same business boat with the actual partners, and no search for that kind of reality is necessary or even in point. There is no occasion to call these arrangements sham or unintended; they are just an inadequate basis for holding the production of income not taxable to those who produce it.

Thus, while I can see how the concept of "good faith" can be bandied back and forth on the conceded facts to support practically any result, I do not perceive how it is or can be anything more than a conclusory label indicating a decision otherwise made. But the holding herein, thus importing to the application of the label a truly functional vitality, seems to me not only legally erroneous for the reasons stated, but practically unfortunate in the invitation and hope extended to beleaguered taxpayers. One need not retreat into a "specialized talk-world" or "think-world" to realize that here is now expression of judicial purpose to validate a simple, but extraordinarily streamlined, method of tax "reduction" or evasion, of infinite adjustability and adaptability, operable by any taxpayer, be he partner or no, and for the benefit of any of "his sisters and his cousins and his aunts," not to speak of those closer, and with stated risk-limits well below the $5,000 here employed if such seem desirable. Reversal here, however tied to some ritual of fact-finding unrelated to business realities, will inevitably stimulate that hope. Nor do

I believe a reviewing court well-advised in upsetting a reasoned, reasonable, and straightforward decision of the tribunal charged with primary responsibility unless it can offer a more direct and understandable concept of the measure of a taxpayer's obligation than is here proffered. I would affirm.