WORCESTER et al. v. PURE TORPEDO CO.
No. 7843.

Circuit Court of Appeals, Seventh Circuit.
May 2, 1942.

Arthur W. Klein and Joseph Harrow, both of Chicago, Ill., and Kenneth E. Pearce, of Carmi, Ill., for appellants.

Donald L. Thompson, of Chicago, Ill., and Charles Wham, of Centralia, Ill., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This was an action brought in the Circuit Court of White County, Illinois, by plaintiffs to recover damages alleged to have been caused by the negligence of the defendant in shooting an oil well with nitro-glycerine. Upon motion of the defendant, a Kentucky corporation, the cause was removed because of diversity of citizenship to the District Court. There was a trial before a jury and a verdict for the defendant, upon which the court entered judgment. To reverse the judgment, plaintiffs appeal.

Plaintiffs, in their complaint, alleged that the defendant entered into an oral contract with plaintiffs to shoot the oil well in a good workmanlike manner, and that the

negligence of the defendant consisted in shooting the well with nitro-glycerine at a time when the well was in a dangerous and unsafe condition, without first swabbing or killing the well, so that the upward pressure then existing in the well forced the torpedo upward and caused a premature explosion resulting in the destruction of plaintiffs' property.

Defendant answered by a general denial and averred that it had no equipment to swab or kill the well and never assumed any duty to do so; that plaintiffs had represented the well had been properly cased and fitted with an adequate control head and valve; that the well had been swabbed and bailed for 24 hours; that the torpedo was lowered with due care in the usual and customary manner in accordance with the prevailing custom and practice; and that the explosion was not due to any act of negligence on its part.

The well was drilled to a depth of 2277 feet and the casing set to a depth of 2255 feet. After the drilling was finished, the well was cleaned and plugged, the casing cemented, the water bailed out, and oil was brought in by swabbing, around 5 a.m. June 6, 1940. The purpose of "swabbing a well" is to clean out substances that might have been forced into the crevices of the sand so that the oil can seep into the well and produce a flow. "Shooting" means exploding nitro-glycerine at the bottom of the well in order to produce a greater flow of oil. Wilson, one of the plaintiffs, arranged with Dale Mendenhall, defendant's shooter, to shoot the well with ten quarts of nitro-glycerine.

Mendenhall had followed the profession of "shooting" oil wells for 27 years prior to the date in question. The wells that he had "shot" varied in depth from 200 feet to 13,000 feet and during his experience he had averaged 125 to 140 "shots" per year, and these "shots" varied in size from a quart to 1,800 quarts of nitro-glycerine.

To check the depth of the well and to make a test for possible obstructions, Mendenhall lowered a dummy shell filled with gravel. It took about 50 minutes to prepare the torpedo after withdrawing the dummy from the well. After Mendenhall had removed the dummy shell, he filled a torpedo with nitro-glycerine and lowered it into the well. When it struck the oil he closed the control head. A control head is a valve placed on top of the well for the purpose of equalizing the upward pressure from the gas in the well.

At the time Mendenhall first went to the well, it emitted a steady flow of gas and when the dummy was lowered into the well, gas puffed for 10 or 15 seconds, then a steady flow of gas returned and was escaping at the time the charged torpedo was started into the well. Mendenhall began to lower the charged torpedo into the well while standing at a truck 22 to 30 feet from the control head. The shell was lowered by means of hydraulic pressure, so that the weight of the shell could be equalized and thereby indicate when the fluid, gas or other obstructions were reached. The torpedo was lowered very slowly and would have taken about 20 minutes to reach the bottom at 2,277 feet. The torpedo reached the oil at a depth of 235 feet, after which Mendenhall slowed up his reel and set his brakes. This was done so Mendenhall could hold the torpedo in position until the control head was closed. At that time, the torpedo was still attached to the line which was taut. Mendenhall then walked to the well and closed the control head. At that time the oil was spurting about one foot over the control head and struck Mendenhall in the face. He closed the control head in such a manner as to prevent cutting the cable. After this operation he walked back to his truck and found that his line was loose, which indicated that the torpedo was off the hook. He then turned and looked toward the control head and saw a 6-inch ribbon of oil flowing through it, which indicated to him that the valve had opened. He then told all those present "to get the hell out of there." The ribbon of oil from the control head got wider and rose to a height of 35 to 40 feet. Had the valve stayed in the position Mendenhall set it, the pressure would have been equalized at the top and the shell would have gone to the bottom. It was 6 or 7 minutes from the time Mendenhall discovered his line was slack until the explosion occurred.

Before lowering the torpedo Mendenhall tested the control head so as to be sure that it would open and close; it opened by a bolt that slipped through a hole in the valve. The valve on the control head, when tested, worked very easily and Mendenhall at the time told Conn and Harston, employees of Wilson, that the packing was out of the control head and suggested tightening it up, but Harston said,

"We have used this on many a well and it is really easy to work."

It is contended that an error of a highly prejudicial character occurred at the trial, because the defendant was permitted to prove that it was a universal custom that oil wells were shot at the owner's risk.

The record discloses that over objection, Mendenhall was asked whether in his 27 years experience in shooting oil wells there was a custom among shooters in that business as to the assumption of risk by the owner of the oil well, and he answered that the well was shot at the owner's risk. In support of the court's ruling, defendant's counsel argues that the shooting of the well grew out of a contract and where a custom exists that well owners assume the risk, an action for negligence is released. With this contention we cannot agree. The rule is well settled that a custom or usage cannot alter or change the standard of conduct required by law. Western Union Cold Storage Co. v. Winona Produce Co., 197 Ill. 457, 459, 64 N.E. 496; Elkton Auto Sales Corporation v. State of Maryland, 4 Cir., 53 F.2d 8, and American Coal Co. v. De Wese, 4 Cir., 30 F.2d 349. In dealing with an agency known to be dangerous, such as the shooting of a well, it becomes the duty of the shooter to exercise the degree of care commensurate with the danger involved. American Glycerin Co. v. Eason Oil Co., 10 Cir., 98 F.2d 479. It necessarily follows that a shooter cannot absolve himself from his duty by claiming that a custom or usage existed which relieved him of exercising due care. To do so would avoid the settled rules of law.

It is also contended that the court erred in admitting evidence of the second shooting of the well by Mendenhall, and in refusing to permit plaintiffs to explain the reasons and circumstances for such second hiring.

It appears that over objection defendant proved that some two months after the premature explosion of June 6, the plaintiffs hired Mendenhall to shoot the well a second time, but the court would not permit plaintiffs to show explanatory facts and circumstances concerning the rehiring and the condition existing at the second shooting.

The defendant insists that such evidence was admissible since it tended to show that plaintiffs themselves did not consider the well, at the time of the first shooting, dangerous or unsafe, nor did they consider Mendenhall negligent or reckless in attempting to shoot the well before first swabbing or killing it. Even so, we believe that plaintiffs should have been permitted to disprove, if they could, the inference arising from the rehiring and reshooting. Chicago City Ry. Co. v. Bundy, 210 Ill. 39, 71 N.E. 28.

The defendant makes the point that even if the testimony of Mendenhall was incompetent and inadmissible, similar testimony of Hager and Munsey, defendant's witnesses, was stricken and the jury adequately instructed on the applicable law and the evidence to be considered. Moreover, the argument continues, the record discloses the verdict for the defendant was the only verdict that justice could approve, therefore the plaintiffs were not prejudiced and the errors were harmless. "While this court will not disturb a judgment for an error that did not operate to the substantial injury of the party against whom it was committed, it is well settled that a reversal will be directed unless it appears, beyond doubt, that the error complained of did not and could not have prejudiced the rights of the party." Vicksburg & Meridian Railroad v. O'Brien, 119 U.S. 99, 103, 7 S.Ct. 118, 120, 172, 30 L.Ed. 299, and McCandless v. United States, 298 U.S. 342, 347, 348, 56 S.Ct. 764, 80 L.Ed. 1205.

To be sure, it frequently occurs that incompetent testimony inadvertently creeps into a record, and the only remedy the party has is to have the court exclude it and to instruct the jury that they should not consider such excluded testimony. Ordinarily this is sufficient to protect the rights of the parties. In the instant case, the admission of Mendenhall's testimony resulted from counsel's persistence in questioning Mendenhall after the court had indicated that such testimony was inadmissible. That fact and the fact that the court would not permit plaintiffs to show explanatory facts and circumstances concerning the rehiring and the condition existing at the second shooting, raises the question whether we can say that it affirmatively appears from the whole record that the court's rulings were not prejudicial to the plaintiffs' cause. Since we cannot be certain that the rulings did not,

it must be presumed that reversible error was committed. Farris v. Interstate Circuit, 5 Cir., 116 F.2d 409, 412 and Fort Dodge Hotel Co. v. Bartelt, 8 Cir., 119 F.2d 253, 259.

For the errors above indicated, we are of the opinion that justice would be better served if the cause were retried. The judgment of the District Court is reversed and the case is remanded for a new trial.