Catherine POIGNANT, Libellant-Appellant,

v.

UNITED STATES of America, Respondent-Appellee.

No. 285, Docket 23530.

United States Court of Appeals Second Circuit.

Argued April 18, 1955.

Decided July 22, 1955.

11.  Simms v. Andrews, 10 Cir., 118 F.2d 803.

Harry Eisenberg, New York City (Jacob Rassner, of counsel, Harvey Goldstein, New York City, on brief), proctor for libellant-appellant.

J. Edward Lumbard, U. S. Atty., Southern Dist. N. Y., New York City, proctor for respondent-appellee, Kirlin, Campbell & Keating, New York City, Walter X. Connor and Vernon Sims Jones, New York City, of counsel.

Before CLARK, FRANK and HINCKS, Circuit Judges.

HINCKS, Circuit Judge.

■ Libellant brought this action to recover for personal injuries sustained while employed as a stewardess on board defendant's vessel, the S. S. Marine Flasher. Her libel contained two causes of action: the first was for recovery on the ground of negligence under the Jones Act, 46 U.S.C.A. § 688, and on the ground of unseaworthiness; the second was for maintenance and cure. The trial court, sitting in admiralty without a jury, dismissed the first cause of action and gave the libellant relief under the second cause of action. No appeal is taken from this latter holding. The sole question confronting us is whether the dismissal of the first cause of action was right.

The S. S. Marine Flasher, on September 20, 1947 while owned and operated by the United States, was docked at Bremerhaven, Germany, for the purpose of discharging passengers. At about 1:20 a. m. on the above date, libellant slipped and fell in one of the passageways located near the vessel's dining room. It is undisputed that her fall and consequent injuries was caused by the presence of an apple skin, or some piece of garbage which looked like an apple skin, on the floor of the passageway.

The findings of fact made below do not precisely state when or how the apple skin got in the passageway. The trial court did find that the vessel had no garbage disposal chutes: the practice was at the conclusion of each meal to pull large cans of garbage from the galley over the passageway in question to the ship's rail for dumping overboard. As to the amount of garbage in the passageway, the findings below went no further than the statement that, " * * * it was not littered with garbage." The findings did not indicate whether the apple skin had been dropped out of one of the garbage cans or whether it had been dropped by a passenger or seaman.

The trial court found that the defendant had no notice, actual or constructive, of the presence of the apple skin in the passageway and held that this lapse in libellant's proof was fatal to her cause of action for negligence. The finding was consistent with the evidence in the case. We think that the trial court rightly ruled that libellant was not entitled under the Jones Act to recover on the ground of negligence. Daniels v. Pacific-Atlantic S. S. Co., D.C.E.D.N.Y., 120 F.Supp. 96; Adamowski v. Gulf Oil Corp., 3 Cir., 197 F.2d 523; Guerrini v. United States, 2 Cir., 167 F.2d 352; Boyce v. Seas Shipping Co., 2 Cir., 152 F.2d 658.

The trial court also held, without accompanying discussion, that the respondent could not be held to have breached its warranty of seaworthiness.

■ Under the general maritime law an injured seaman, once he proves an injury caused by an unseaworthy condition, may recover without proof of negligence on the part of the vessel's owner. In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 66 S.Ct. 872, 877, 90 L.Ed. 1099, the Supreme Court, in referring to the doctrine of unseaworthiness, stated: "It is essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. * * * It is a form of absolute duty owing to all within the range

of its humanitarian policy." See also The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. Since the inquiry in unseaworthiness cases is not directed to the issue of the owner's fault, it follows that prior notice, actual or constructive, of the unseaworthy condition is not essential to a cause of action based on that doctrine.

■ That such is the law is further apparent from the decision of the Supreme Court in Alaska S. S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798. In this case, the court held that the relinquishment of control over the vessel to an independent contractor did not serve to exonerate the owner from his absolute liability: it even applied that rule to defective equipment which had been brought on board by the contractor and over which the owner had no control. On this point, the Petterson case, in affirming Petterson v. Alaska S. S. Co., 9 Cir., 205 F.2d 478, overruled several decisions of this court,—a fact which we noted in Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 213 F.2d 397. See also our decision in Tarkington v. United States Lines Co., 2 Cir., 222 F.2d 358. Since lack of control does not prevent the accrual of absolute liability for unseaworthiness, there is no reason why that liability should depend upon notice to the owner.

■ However, other problems are presented. Here the accident occurred after the voyage had been commenced and while the vessel was docked in a foreign port. It now seems settled that an owner is absolutely liable for injuries sustained by a seaman after the inception of the voyage *when the injuries are caused by an unseaworthy condition which existed before the vessel commenced her voyage or before she departed from her home port.* Dixon v. United States, 2 Cir., 219 F.2d 10; Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927; Balado v. Lykes Bros. S. S. Co., 2 Cir., 179 F.2d 943.

Here, however, the alleged unseaworthy condition, like the accident itself, in all likelihood *arose after the voyage had commenced.* Does the doctrine of absolute liability for unseaworthiness apply in such cases?

■ In the Dixon case, supra, this court found it unnecessary to rule upon that point. Here, however, the fact situation is such that the question must be answered and the answer, we think, depends upon applicability of the concept of control. In the Dixon case it was said [219 F.2d 15]: "Moreover, while the vessel is at her home port the owner has opportunities—not always, or to the same extent, available after the voyage starts—to correct dangerous conditions aboard the ship." This may well be true. However, as already noted, it was held in the Petterson case that absence of control by the owner does not exonerate him from absolute liability for unseaworthy conditions. We think that the rationale of that decision extends as well to unseaworthy conditions arising after the voyage began as to those earlier arising. We hold, therefore, that although the condition here complained of did not arise until after the voyage began and the vessel was in a foreign port, recovery was not barred on that account.

We now come to the main problem in this case. Did the presence of an apple peel on the floor of a public corridor in the vessel constitute an unseaworthy condition, for the harmful effect of which the owner is absolutely liable to a member of the crew? As to this, there have been a number of cases involving transitory substances temporarily in the vessel and the cause of harm, in which it was held that there was no breach of the warranty of seaworthiness. Cookingham v. United States, 3 Cir., 184 F.2d 213, certiorari denied 340 U.S. 935, 71 S.Ct. 495, 95 L.Ed. 675; Adamowski v. Gulf Oil Corp., D.C., 93 F.Supp. 115, affirmed 3 Cir., 197 F.2d 523; Daniels v. Pacific-Atlantic S. S. Co., D.C.E.D.N.Y., 120 F.Supp. 96; The Seeandbee, 6 Cir., 102 F.2d 577.

The Petterson case, later decided, makes it plain that the results reached in this line of cases cannot be justified by

the mere fact that the existence of such a condition was not brought to the knowledge of the owner or that he lacked opportunity to prevent or correct the condition. Nevertheless, that opinion does not go so far as to hold that unseaworthiness arises from every defect in a vessel or in its equipment and maintenance, whether consisting of a transitory substance or otherwise. As to this, subsequent to the Petterson decision the Supreme Court has held, in a suit by a seaman for an assault by a fellow member of the crew, that the owner was liable but only because the offending seaman was not " 'equal in disposition and seamanship to the ordinary men in the calling.' " Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336, 75 S.Ct. 382, 384. In the Boudoin opinion the court makes it abundantly clear that it has not overruled the long-settled doctrine that to be seaworthy a vessel does not need to be free from all cause for mishap,—that it is enough if it is *reasonably fit*. In its opinion the court cited The Silvia, 171 U.S. 462, 19 S.Ct. 7, 8, 43 L.Ed. 241, for its statement that "the test of seaworthiness [in a cargo suit] is whether the vessel is *reasonably* fit to carry the cargo." (Emphasis supplied.) And to like effect it cited The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65. It approved the use made of this test in Keen v. Overseas Tankship Corp., 2 Cir., 194 F.2d 515, quoting from Judge Learned Hand's opinion in that case as well as from his opinion in Jones v. Lykes Bros. S. S. Corp., 2 Cir., 204 F.2d 815. And the Boudoin opinion, as to the test of seaworthiness, further said: "The problem, as with many aspects of the law, is one of degree. Was the assault within the usual and customary standards of the calling?" If so, it was said, "it is one of the risks of the sea that every crew takes."

■ We think the import of the Boudoin case is that just as the vessel is not unseaworthy because of the misbehavior of a seaman whose disposition and skill is the equal of that of ordinary men in the calling, so it does not become unseaworthy by reason of a temporary condition caused by a transient substance if even so the vessel was as fit for service as similar vessels in similar service. This was essentially the holding of Doucette v. Vincent, 1 Cir., 194 F.2d 834, 838, in which it was said that to make his vessel seaworthy an owner is not obligated to provide "the best possible vessel and gear" and that his obligation is satisfied by provision of a vessel and gear "reasonably safe and suitable" even if there may have been equipment "more modern or more perfect in some detail." We so held in Berti v. Compagnie De Navigation Cyprien Fabre, supra. We there ventured a conclusion that our holding was not in conflict with the Petterson case. The later decision of the Supreme Court in Boudoin v. Lykes Bros. S. S. Corp. confirms that view. And so, we hold, although the owner is absolutely liable for failure to provide a vessel which measures up to the standard of the law, that standard is not perfection but reasonable fitness.

■ Since the dismissal of the claim based on alleged unseaworthiness was not required by the bare facts stated in the findings below, it becomes necessary to consider whether there was sufficient evidence on this issue to raise questions of fact which only the trial judge can resolve. As to this, there was some testimony tending to support possible inferences (1) that the absence of garbage chutes on the vessel was the proximate cause of the accident and (2) that comparable vessels generally are provided with such chutes.[1] Especially since this testimony involves questions of credibility, its weight and any inferences which it may, or may not, require are matters for determination by the trial judge.

[1] That comparable vessels generally are not provided with such chutes is one factor, but not necessarily a conclusive factor, which the trier may consider in judging of unseaworthiness. The T. J. Hooper, 2 Cir., 60 F.2d 737.

Reversed and remanded for retrial on the issue of unseaworthiness.

FRANK, Circuit Judge (concurring).

1. I agree that, in the circumstances, we should remand not only for further findings,[1] but for a retrial of the issue of unseaworthiness. For the Supreme Court and other federal courts, including our court, have often held that "to the end that injustice may not be done," it is proper and wise (1) not only to remand for further findings but also (2) for a retrial on additional evidence, even when the appellant on the record as it stands, has not made out his case as plaintiff, or his defense as a defendant. This practice began in 1833 with Estho v. Lear, 7 Pet. 130, 8 L.Ed. 632, and, since then, has frequently been adopted. See, e. g., Armstrong v. Lear, 8 Pet. 52, 71–74, 8 L.Ed. 863; United States v. Rio Grande Dam & Irrigation Co., 184 U.S. 416, 423–424, 22 S.Ct. 428, 46 L.Ed. 619; Lincoln Gas & Electric Light Co. v. City of Lincoln, 223 U.S. 349, 361–365, 32 S.Ct. 271, 56 L.Ed. 466; Ford Motor Co. v. N. L. R. B., 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221; Porter v. Leventhal, 2 Cir., 160 F.2d 52, 59; Benz v. Celeste Fur Dyeing & Dressing Corp., 2 Cir., 136 F.2d 845, 848; Levesque v. F. H. McGraw & Co., 2 Cir., 165 F.2d 585, 587; Nachman Spring-Filled Corp. v. Kay

[1] I think it desirable, in order to clarify the issues on the retrial, to point out that, even on the evidence now in the record, the trial judge could reasonably have found that

(a) the garbage on which plaintiff slipped was present because of the way the ship handled its garbage;

(b) the ship had a reasonable opportunity—by not allowing garbage to spill—to prevent the presence of that garbage; and

(c) another similar vessel had abandoned this mode of handling garbage and had substituted garbage chutes.

The evidence which would support such findings is as follows:

(1) Miss Jenkinson, a stewardess on the Marine Flasher on the same voyage, testified thus: Before the day on which the plaintiff's accident happened, she had frequently seen garbage "fall off," in the passageway and elsewhere, from overloaded drums, containing garbage, while they were being hauled to the ship's side. Several witnesses testified that certain of the ship's personnel were assigned to keeping the passageway clean.

From this testimony the judge surely could draw a reasonable inference that the garbage on which plaintiff slipped had dropped when the drums were pulled through the passageway. Were this a suit under the F. E. L. A., or the Jones Act, I think there can be no doubt that such an inference would be proper. See, e. g., Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Jesionowski v. Boston & M. R. R. Co., 1947, 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416; Ellis v. Union Pac. R. Co., 1947, 329 U.S. 649, 67 S.Ct. 598, 91 L.Ed. 572; Lillie v. Thompson, 1947, 332 U.S. 459, 68 S.Ct. 140, 92 L.Ed. 73; Johnson v. United States, 1948, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468; Wilkerson v. McCarthy, 1949, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497; Affolder v. New York, C. & St. L. R. Co., 1950, 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683; Stone v. New York, C. & St. L. R. Co., 1953, 344 U.S. 407, 73 S.Ct. 358, 97 L.Ed. 441; Smalls v. Atlantic Coast Line R. Co., 1955, 348 U.S. 946, 75 S.Ct. 439, reversing 4 Cir., 216 F.2d 842; Palum v. Lehigh Valley R. Co., 2 Cir., 165 F.2d 3, 5–6; Korte v. New York, N. H. & H. R. Co., 2 Cir., 191 F.2d 86, 88. A fortiori, is it permissible in a suit by a seaman based on unseaworthiness. For the Supreme Court has held that the duties owed by a ship to its seamen rank higher than those of a railroad to its workers. See Callen v. Pennsylvania R. Co., 332 U.S. 625 (cf. 631), 68 S.Ct. 296, 298, 92 L. Ed. 242, rejecting a contrary suggestion made in Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757, at pages 768–769, 164 A.L.R. 387.

In Petterson v. Alaska S. S. Co., 9 Cir., 205 F.2d 478, 479, the court said: "In making this inference we do not rely upon the tort doctrine of res ipsa loquitur, although the result is similar"; this decision was affirmed, without opinion, by the Supreme Court in Alaska S. S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798.

(2) Miss Jenkinson also testified that, before serving on The Marine Flasher, she had worked on The Ernie Pyle, a C-4 like the Marine Flasher; and that on The Ernie Pyle, she had seen garbage similarly handled "*until they put garbage chutes in it.*" (Emphasis added.)

Mfg. Co., 2 Cir., 139 F.2d 781, 787; Pfeil v. Jamison, 3 Cir., 245 F. 119.

2. My colleagues seem to say that, in order to win, plaintiff must persuade the trial judge "that comparable vessels *generally* are provided with chutes." (Emphasis added.) However, in a footnote to this statement, they qualify this statement, citing The T. J. Hooper, 2 Cir., 60 F.2d 737, 739. I think it desirable to point out more explicitly what that case decided. There we held tugs unseaworthy for failure, in 1928, to install radio receiving sets by means of which they would have received broadcasts from Arlington of bad weather that should have caused them to seek shelter for their tows. The evidence showed that, in 1928, although some tugs were thus equipped, tugs generally had not adopted such equipment. We said (per Judge Learned Hand): "It is not fair to say that there was a general custom among coastwise carriers so to equip their tugs. One line alone did it; as for the rest, they relied upon their crews, so far as they can be said to have relied at all. An adequate receiving set suitable for a coastwise tug can now be got at small cost and is reasonably reliable if kept up; obviously it is a source of great protection to their tows. Twice every day they can receive these predictions, based upon the widest possible information, available to every vessel within two or three hundred miles and more. * * * They can have at hand protection against dangers of which they can learn in no other way. Is it then a final answer that the business had not yet generally adopted receiving sets? There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. Ketterer v. Armour & Co., 2 Cir., 247 F. 921, 931, L.R.A.1918D, 798; Spang Chalfant & Co. v. Dimon, etc., Corp., 2 Cir., 57 F.2d 965, 967. Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission. Wabash R. Co. v. McDaniels, 107 U.S. 454, 459–461, 2 S.Ct. 932, 27 L.Ed. 605; Texas & P. R. Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905; Shandrew v. Chicago, etc., R. Co., 8 Cir., 142 F. 320, 324, 325; Maynard v. Buck, 100 Mass. 40. But here there was no custom at all as to receiving sets; some had them, some did not; the most that can be urged is that they had not yet become general. Certainly in such a case we need not pause; when some have thought a device necessary, at least we may say that they were right, and the others too slack. * * * We hold the tugs therefore because had they been properly equipped, they would have got the Arlington reports. The injury was a direct consequence of this unseaworthiness."

In the T. J. Hooper case, we cited by way of analogy as to "reasonable fitness," cases dealing with the standard of reasonable care in negligence cases. In such litigation, some of the cases exclude evidence of a general practice if offered by a defendant. Other cases hold that it is admissible (a) when offered by a plaintiff to show defendant's departure from the standard of due care or (b) when offered by defendant to show his adherence to it. But the furthest the negligence cases go is that, where a defendant introduces such evidence—i. e., that others behaved as he did—it has some persuasive power but can never be conclusive, so that, in a jury case, it cannot justify a directed verdict for the defendant. In Texas & P. R. Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905, the Court rejected defendant's argument that the trial judge erred in declining to charge the jury "that the question whether the defendant was liable depended on whether the freight train was handled in the usual and ordinary manner." The Court (per Holmes, J.) said: "What usually is done may be

evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." In Grand Trunk R. Co. v. Richardson, 91 U.S. 454, 469, 23 L.Ed. 356, the Court said: "The second assignment of error is, that the court excluded testimony offered by the defendant to show that the usual practice of railroad companies in that section of the country was not to employ a watchman for bridges like the one destroyed. It is impossible for us to see any reason why such evidence should have been admitted. The issue to be determined was whether the defendant had been guilty of negligence; that is, whether the defendant had failed to exercise that caution and diligence which the circumstances demanded, and which prudent men ordinarily exercise. Hence the standard by which its conduct was to be measured was not the conduct of other railroad companies in the vicinity; certainly not their usual conduct." See also Wabash R. Co. v. McDaniels, 107 U.S. 454, 460–461, 2 S. Ct. 932, 27 L.Ed. 605; Brigham Young University v. Lillywhite, 10 Cir., 118 F. 2d 836, 840, 137 A.L.R. 598; Worcester v. Pure Torpedo Co., 7 Cir., 127 F. 2d 945, 947; In Uline Ice, Inc., v. Sullivan, 88 U.S.App.D.C. 104, 187 F.2d 82, 84, a negligence suit, the court held that the trial judge, in denying a directed verdict for the defendant, correctly ruled "that what was customary and usual" (as shown by what others did) "was merely persuasive as to what constituted due care"; the court said "the mere fact that exhibitors generally provide a certain measure of protection to spectators does not preclude the possibility that reasonable men would have provided a greater measure."

As my colleagues make much of Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336, 75 S.Ct. 382, I think it desirable to discuss that case, as I think my col-

leagues seem to misinterpret it. There the plaintiff, a seaman employed on defendant's ship, was injured as a result of an exceptionally brutal assault, with a knife, by a fellow seaman, who was " 'a person of dangerous propensities and proclivities.' " There was no evidence that the defendant knew or could reasonably have learned of those propensities.[2] In short, the defect was latent and undiscoverable by the ship; yet the Supreme Court—approving and quoting from Judge Learned Hand's opinion in Keen v. Overseas Tankship Corp., 2 Cir., 194 F.2d 515—held defendant liable because the ship was unseaworthy, "irrespective of any fault." (Here the Court went beyond The Rolph, 9 Cir., 299 F. 52, where the ship was held liable for a brutal assault by a seaman who was known to be brutal.)

By way of well-considered dictum—answering an argument made by the court below, 2 Cir., 211 F.2d 618—the Supreme Court differentiated Boudoin's case from one in which a sailor injures another sailor in a sailor's fist-fight. The Court stated that then the ship would not be liable, assimilating such a case to that of seaworthiness with respect to a ship's hull and gear, as to which it said: "The warranty of seaworthiness does not mean that the ship can weather all storms." No more, said the Court in effect, must the ship's crew be men with the disposition of a Lord Chesterfield.[3] In short, perfection of hull or gear or crew is not required, because perfection is not possible. Thus the shipowner does not warrant that the worst of storms will not destroy the vessel, for the reason that ships able to withstand all storms are not available. No more available are crew-members with such dispositions that they will use their fists only in circumstances that would stimulate an ordinary office-worker to engage in a brawl. If the owner has selected a sailor from among those men

2. See Boudoin's case in the Court of Appeals, 2 Cir., 211 F.2d 618, at page 620, 622.

3. Here the Court cited and quoted from Judge Learned Hand's opinion in Jones v. Lykes Bros. S. S. Co., 2 Cir., 204 F.2d 815.

who alone are available in the seamen's calling, his fellows take the risk that he will be as rough as such men usually are.

The fact that gentler men are not available is a matter of defense. Of that well-known, obvious, fact, the courts take judicial notice, just as they take such notice of the well-known inability to obtain ships no storm will demolish. Those facts are notorious. If they were not, the ship, to make out the defense, would have to introduce evidence of such facts.

Here the defendant owed plaintiff an absolute duty to provide a safe place to work. It may well be that, if defendant were to prove that there were no means, reasonably available, to keep the passageway free of garbage, the existence of the dangerous condition would not have constituted unseaworthiness; but the fact of such unavailability is a defense which defendant has the burden of proving.

In this connection, I think it well also to discuss Doucette v. Vincent, 1 Cir., 194 F.2d 834, 838 which my colleagues cite. There plaintiff, a member of the crew of defendant's fishing vessel, was injured when working on an electric winch; the plaintiff based his action on unseaworthiness; the case was tried to a jury which returned a verdict for defendant. The First Circuit, affirming the judgment on the verdict, held that the trial judge had discretion, as in negligence cases, to exclude evidence, offered by plaintiff, that safer equipment, "more modern or more perfect in some detail", was available. The court said that the standard of seaworthiness is the same as that in negligence cases, i. e., to supply "reasonably safe and suitable" equipment. The court chiefly cited Jones Act or other negligence decisions. It cited, too, The Rolph, 9 Cir., 299 F. 52 —which I think not in point for reasons stated above—and also The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65, and May v. Hamburg, etc., Gesellschaft, 290 U.S. 333, 346, 54 S.Ct. 162, 78 L.Ed. 348, both suits under the Harter Act in which, by explicit statutory language, the standard is "due diligence," a recognized relaxation of the non-statutory standard of seaworthiness. If the Doucette opinion means that the seaworthiness standard never grows more demanding despite the ready availability of new safer devices, I think it wrong and at variance with Judge Learned Hand's ruling in The T. J. Hooper, quoted supra.[4]

A majority of the Third Circuit, in Cookingham v. United States, 184 F.2d 213, 215, has held that a shipowner is not liable for an unsafe condition resulting solely from the "transitory" presence of a foreign substance. Judge Biggs, dissenting in that case, admirably stated, as follows, what I believe the correct position: "The duty of the owner to maintain a seaworthy ship is an absolute one: The Osceola, 189 U.S. 158, 173–175, 23 S.Ct. 483, 47 L.Ed. 760. It has no connection with negligence. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. If the ship or her gear is not safe for use, the ship is not seaworthy. I think that both the court below and this court have returned to the doctrine of negligence of Plamals v. The Pinar Del Rio, 277 U.S. 151, 48 S. Ct. 457, 72 L.Ed. 827. In Mahnich v. Southern S. S. Co., supra, the Supreme Court pointed out that before the decision in The Osceola, ' * * * the right of the seaman to recover for injuries caused by unseaworthiness seems to have been rested on the negligent failure, usually of the seaman's officers or fellow seamen to supply seaworthy appliances', (321 U.S. 96, 64 S.Ct. 457), and that The Osceola made plain that the duty of the shipowner to maintain the vessel in a seaworthy condition was an absolute one. In the Mahnich case, the Supreme Court

---

4. We cited the Doucette case in Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 213 F.2d 397, 400. But there the question was whether plaintiff's fellow-workers were competent, a question of the skill of available workers in that sort of job.

disapproved Plamals v. The Pinar Del Rio to the extent that the latter decision conflicted with the principle just stated. 321 U.S. at page 105, 64 S.Ct. at page 460. I assume that the majority would concede that if the foreign substance, jello, had remained upon the stairway of the 'Peckham' for several days, the stairway, and hence the ship, should have been deemed to have been unseaworthy. Someone spills grease upon a rope or jello upon a stairway. The rope, an appliance, and the stairway are unseaworthy if they are thereby rendered unfit for the use for which they were intended. As was said in the Mahnich case, 321 U.S. at page 104, 64 S.Ct. at page 459, quoting from The Osceola, '* * * the owners' obligation is "to supply and keep in order the proper appliances appurtenant to the ship."' While the spilling of grease upon a rope or jello upon a stairway might be an act of negligence for which recovery might be had by an injured seaman under the Jones Act, 46 U.S.C.A. Section 688, once the dangerous situation has been created it is the absolute obligation of the shipowner to correct it. If it is not corrected and a seaman is injured because of it the shipowner must answer in damages. This is the equivalent of the requirement of 'a safe place to work' for the seaman, a doctrine not novel in the admiralty law. See the Mahnich opinion, 321 U.S. at page 102, 64 S.Ct. at page 458, and the authorities cited therein. The majority apparently are of the opinion that because the stairway on the 'Peckham' was 'transitorily' in an unsafe state that this absolves the shipowner from liability. Incidentally, it nowhere appears how long the jello had remained upon the stairway, albeit, in my view, the period during which the stairway was in an unsafe state is immaterial under the circumstances of the instant case. If the stairway was in a condition dangerous for the use for which it was intended, however, 'transitorily', it was unseaworthy. It remained so while the unsafe condition persisted. The element of time which has intruded itself in this case in both the opinion of this court and that of the court below is irrelevant under the doctrine of the shipowner's absolute liability."

The Third Circuit has since interpreted its Cookingham "transitory" doctrine to mean that the ship's liability for a "transitory" object depends upon the length of time during which the object was not removed. See Crawford v. Pope & Talbot, Inc., 3 Cir., 206 F.2d 784, 789-790. I understand that my colleagues repudiate that thesis. The Third Circuit, in a still later case, explaining the Cookingham doctrine, has said that it turns on a distinction between (a) the duty to provide a seaworthy ship, which is absolute, and (b) the duty to provide a safe place to work, which, so that court holds, demands reasonable care only. See Brabazon v. Belships Co., 3 Cir., 202 F.2d 904, 906. I think that distinction directly at odds with the Supreme Court's decisions. I read my colleagues' opinion as repudiating it also.