10-70-cv
TIFD III-E, Inc v. United States

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued: May 16, 2011                                    Decided: January 24, 2012 )

Docket No. 10-70-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

TIFD III-E, INC.,
                    *Plaintiff - Appellee*,

v.

UNITED STATES OF AMERICA,
                    *Appellant.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:    LEVAL, CABRANES, SACK, *Circuit Judges*.

        The United States appeals from a judgment of the United States District Court for the District of Connecticut (Underhill, *J.*) invalidating two notices of Final Partnership Administrative Adjustments issued by the Internal Revenue Service.  The district court so ruled because it concluded that the taxpayer-plaintiff's characterization of two tax-exempt Dutch banks as its partners in Castle Harbour LLC was proper under Internal Revenue Code § 704(e)(1).  The district court also concluded that, even if the banks did not qualify as partners under § 704(e)(1), the government was not entitled to impose a penalty pursuant to Internal Revenue Code § 6662.  The Court of Appeals (Leval, *J.*) holds that the evidence compels the conclusion that the banks do not qualify as partners under § 704(e)(1), and that the government is entitled to impose a penalty on the taxpayer for substantial understatement of income.  The judgment of the district court is **REVERSED**.

WILLIAM F. NELSON (David J. Curtin, James D. Bridgeman, *on the brief*), Bingham McCutchen LLP, Washington, D.C., for *Appellee*.

FRANCESCA U. TAMAMI, Tax Division, Department of Justice (John A. DiCicco, Gilbert S. Rothenberg, Kenneth L. Greene, Tax Division, Department of Justice, Nora Dannehy, United States Attorney, District of Connecticut, *on the brief*), for *Appellant*.

LEVAL, *Circuit Judge*:

This appeal requires us to examine for the second time the propriety of a partnership's allocation (for tax purposes) of virtually all of its taxable income to two ostensible partners, both foreign banks, which are not subject to tax by the United States. The issues on appeal are (1) whether the foreign banks qualify as partners in the partnership under Internal Revenue Code ("I.R.C.") § 704(e)(1), and (2), if not, whether a penalty was properly imposed by the Internal Revenue Service pursuant to I.R.C. § 704(e)(1).

In 1993, two Dutch banks, ING Bank N.V. and Rabo Merchant Bank N.V., purchased an interest in Castle Harbour LLC, a partnership in which TIFD III-E, Inc., a subsidiary of General Electric Capital Corp. ("GECC"), served as the tax-matters partner. In 2001, the IRS rejected Castle Harbour's classification of the banks as partners and issued two notices of administrative adjustment reallocating a large percentage of the partnership's income for the years 1993 to 1998 from the banks to TIFD III-E (the "taxpayer").

The taxpayer brought suit challenging the notices of adjustment in the U.S. District Court for the District of Connecticut. After a bench trial, the court found that the banks were properly characterized for tax purposes as partners, not lenders (as the government had contended), and

2

ruled the notices invalid. *TIFD III-E, Inc. v. United States*, 342 F. Supp. 2d 94 (D. Conn. 2004). The government appealed. We found that the district court erred by not examining the nature of the banks' interest in the partnership under the totality-of-the-circumstances test of *Commissioner v. Culbertson*, 337 U.S. 733 (1949). *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 231 (2d Cir. 2006). Applying that test, we held that the evidence compelled the conclusion that the banks' interest was not "bona fide equity participation," but instead "overwhelmingly in the nature of a secured lender's interest." *Id.*

We remanded to the district court for consideration in the first instance of the taxpayer's further argument that, regardless of the outcome of the *Culbertson* inquiry, the banks qualified as partners under I.R.C. § 704(e)(1), which provides that "[a] person shall be recognized as a partner . . . if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift . . . ." The district court, relying on the previously established trial record, ruled that the banks qualified as partners under that provision. *TIFD III-E, Inc. v. United States*, 660 F. Supp. 2d 367, 395 (D. Conn. 2009). The court further ruled that even if the banks did not qualify as partners under § 704(e)(1), the government could not properly assess a penalty pursuant to I.R.C. § 6662 against the taxpayer for underpayment of tax because "substantial authority" supported the treatment of the banks' interest as equity for tax purposes. *Id.* at 400.

The government again appeals. Although the district court's analysis was thorough and thoughtful, we find that the banks' interest was not a capital interest within the meaning of § 704(e)(1) for essentially the same reasons as supported our earlier conclusion that the banks' interest was not bona fide equity participation. In addition, we conclude that the taxpayer failed

3

to point to substantial authority supporting its position, and that the government is therefore entitled to impose a penalty on the taxpayer for substantial understatement of income. Accordingly, we reverse the judgment of the district court.

*Background*

The material, and extraordinarily complex, facts of this case consist essentially of the rights and obligations created between the taxpayer and the Dutch banks by the partnership agreement. They are comprehensively described in the district court's initial opinion and its opinion on remand, as well as in our previous opinion. We refer the reader to those opinions for a detailed recitation of the events leading to the formation of Castle Harbour and of the terms of the partnership agreement. The abbreviated account we give here includes only those facts necessary to explain our reversal of the judgment.

A.    *The Partnership Agreement*

In the early 1990s, GECC, which had long been in the business of leasing commercial aircraft, found itself in the position of owning a fleet of aircraft that had been fully depreciated for tax purposes. The aircraft could thus no longer serve as the basis for depreciation deductions, which had substantially sheltered GECC's income from federal tax. GECC solicited proposals for alternative methods of financing its ownership of these aircraft. In accordance with one of these proposals, GECC caused the formation of an eight-year partnership, later named Castle Harbour. The taxpayer and another GECC subsidiary transferred to Castle Harbour assets worth a total of $590 million, including a fleet of fully depreciated aircraft under lease to airlines. The two Dutch banks, neither subject to tax by the United States, contributed $117.5 million in cash.

4

A maze of contractual provisions in the partnership agreement dictated how the revenues, losses, and assets of Castle Harbour would be allocated among its ostensible partners – the two GECC subsidiaries and the two Dutch banks. At bottom, however, the partnership agreement was designed essentially to guarantee the reimbursement (according to a previously agreed eight-year schedule) of the banks' initial investment of $117.5 million plus an annual rate of return of 9.03587% (or in some circumstances 8.53587%), referred to in the agreement as the "Applicable Rate."

The partnership agreement did not *expressly* guarantee that the banks would receive a return at the Applicable Rate. Some of its provisions, examined in isolation, were designed to give the appearance of creating the potential for a greater or lesser return in the case of unexpected profits or losses. A web of other provisions, however, together functioned to ensure that there was effectively no practical likelihood that the banks' return would deviate more than trivially from the Applicable Rate.

1. *The division of assets, revenues, and losses*

Using complex definitions, the partnership agreement allocated 98% of what the parties and the district court referred to as the "Operating Income" of the partnership to the banks. *See TIFD III-E*, 342 F. Supp. 2d at 101. Operating Income was a flexible classification. It included most of the partnership's taxable income, while allowing the taxpayer when it so desired to reclassify an income stream, taking it out of Operating Income and designating it instead as a "Disposition Gain." Disposition Gains were allocated (after a threshold amount) almost entirely to the taxpayer. For tax purposes, the allocation of 98% of the partnership's Operating Income to the tax-exempt Dutch banks meant that only a tiny portion of the income of the partnership would be subject to tax.

5

The partnership's Operating Income was reduced by expenses, the largest of which was the aggressive depreciation of the aircraft. Because the aircraft had already been fully depreciated for tax purposes, however, this depreciation did not serve to reduce the partnership's taxable income. As a result, the 98% allocation of Operating Income to the banks created an enormous discrepancy between the banks' share of the partnership's taxable income and their share of its book value. When it came to the actual division of the assets, revenues, and losses, the partnership did not credit the banks' capital accounts with the same 98% of the taxable Operating Income described above, but rather with 98% of a much smaller figure, drastically reduced by depreciation charged against the already fully depreciated aircraft.

2.    *Provisions ensuring that the banks received no less than the Applicable Rate*

Several aspects of the partnership agreement effectively insured that the banks would recover their investment with a return at no less than the Applicable Rate.[1]

Exhibit E of the partnership agreement specified the amounts the banks would receive in annual cash distributions. The Exhibit E payments were calculated to reimburse the banks' $117.5 million investment, plus provide a return at the agreed Applicable Rate. Whether Castle Harbour had a profit or loss did not affect the Exhibit E payments.

In addition, each Castle Harbour partner had a "capital account" and an "Investment Account." The capital account represented each partner's ostensible share of the partnership capital. Annually, the banks' capital accounts were to be credited or debited with the amount of their allocable shares of Castle Harbour's income or loss, and debited to reflect distributions of

---

[1] We discussed in our previous opinion those aspects of the agreement that effectively insured that the banks would receive no more than the Applicable Rate. *See TIFD-III*, 459 F.3d at 234-35.

cash or property. The Investment Accounts for the banks did not hold money, but instead kept track of the minimum balance that the banks would almost certainly receive upon dissolution. The opening balance was the banks' investment, and, at the time the banks exited the partnership, the "balance was to be recalculated . . . as if every year the balance had been increased by a defined Applicable Rate but also reduced by the Exhibit E payments." *TIFD-III*, 342 F. Supp. 2d at 104. If, at the dissolution of Castle Harbour, the amount in the banks' Investment Accounts exceeded the amount in their capital accounts, the partnership agreement required that the banks receive a "Class A Guaranteed Payment" virtually equal to the difference between those two figures. *Id.*

The banks ran some risk that they would receive less than the Applicable Rate of return because the Class A Guaranteed Payment did not cover all potential losses that could be allocated to their capital accounts. But, as the district court found in its initial opinion, this risk was "minimal." *TIFD III-E*, 342 F. Supp. 2d at 106. Uncovered losses could be allocated to the banks' capital accounts only if the partnership's combined Operating and Disposition Losses exceeded roughly $7 million, and even then only 1% of the excess losses could be allocated to their capital accounts. *Id.* The partnership agreement allocated 100% of partnership losses exceeding $541 million to the banks' capital accounts, but the possibility of losses that large was so remote that the district court dismissed it as "not relevant" in its initial opinion. *Id.* at 101 n.16.

The banks' recovery of their investment and receipt of a return at the Applicable Rate was elaborately protected by three additional features of the partnership agreement: (1) The taxpayer was required by the partnership agreement to keep high-grade commercial paper or cash in an amount equal to 110% of the current value of the banks' Investment Accounts. (2)

The partnership was obliged for the banks' protection to maintain $300 million worth of casualty-loss insurance. And, most importantly, (3) GECC – a large and very stable corporation – gave the banks its personal guaranty, which effectively secured the partnership's payment obligations to the banks.

B.    *Our Previous Opinion*

At the end of the bench trial, the district court found that the banks' interest in Castle Harbour was properly treated as equity. The court's finding rested primarily on its determination that the banks were not owed a "sum certain" because, while they incurred only a "minimal" risk of a return below the Applicable Rate, they enjoyed "unlimited upside potential." *TIFD III-E*, 342 F. Supp. 2d at 106, 117.

We reversed the judgment. Applying the totality-of-the-circumstances test of *Commissioner v. Culbertson*, 337 U.S. 733 (1949), we found that the evidence compelled the conclusion that "the Dutch banks' interest was overwhelmingly in the nature of a secured lender's interest, which would neither be harmed by poor performance of the partnership nor significantly enhanced by extraordinary profits." *TIFD III-E*, 459 F.3d at 231. Accordingly, we ruled that the banks' interest was not "bona fide equity participation." *Id.*

Assessing the terms of the partnership agreement as a whole, we found that the banks' "unlimited share of the upside potential," which was largely the basis of the district court's ruling, existed only in theory. *Id.* at 233-34. As a practical matter, the taxpayer's power to reclassify Operating Income as a "Disposition Gain" and thus allocate the income mostly to itself, combined with its right to terminate the banks' interest on payment of a negligible premium, virtually nullified any possibility that the banks would share meaningfully in profits in excess of the Applicable Rate of return. *Id.* at 234-35. We explained that the district court's

8

analysis was further flawed by its failure to consider two factors, both of which strongly indicated that the banks' interest was properly characterized as debt: (1) that the mechanisms of the partnership agreement ensured that the banks would receive an annual return at the Applicable Rate, "regardless whether Castle Harbour was experiencing profits or losses," *id.* at 239, and (2) that the partnership agreement gave the banks the ability to force payment of what was effectively their principal and interest by permitting them to terminate their interest and receive reimbursement of their $117.5 million investment at the agreed annual rate of return, an ability "very different from an ordinary equity partner's ability to force liquidation of a partnership," *id.* at 238.

Noting that we had "not considered" the taxpayer's alternative argument that the banks qualified as partners in Castle Harbour under I.R.C. § 704(e), we left this question "for consideration in the first instance by the district court." *Id.* at 241 n.19.

C.      *The District Court's Opinion on Remand*

On remand, the government argued to the district court that our holding that the banks' interest was not bona fide equity participation precluded the court from finding, on the same factual record, that the banks qualified as partners under § 704(e)(1). The district court rejected this argument for two reasons. First, it explained that "if the question of the Dutch Banks' status under section 704(e) were closed, the Second Circuit would not have remanded this case with instructions to consider that question." *TIFD III-E*, 660 F. Supp. 2d at 384. Second, it concluded that our holding that the banks' interest was not bona fide equity participation, but rather in the nature of a secured loan with an insignificant equity kicker, did not "necessarily distinguish" the banks' interest from other debt-like interests, such as preferred stock, that are nevertheless treated as equity for tax purposes. *Id.*

9

The district court then proceeded to consider whether the banks qualified as partners in Castle Harbour under §704(e)(1), a provision adopted into the Internal Revenue Code in 1951. *See* Pub. L. No. 82-183, § 340(a) (1951). The court concluded that the banks met the requirements of § 704(e)(1) because (1) they, as opposed to some other entity, truly owned their interest in Capital Harbour; (2) their interest was a capital interest; and (3) capital, in the form of aircraft, was a material income-producing factor for Castle Harbour. *Id.* at 387-393.

The court determined that the banks' interest was a capital interest because the banks incurred "real risk" that their capital accounts would be negative upon dissolution, requiring them to restore the deficit. *Id.* at 391. The court attributed this "real risk" to the possibility of partnership losses sufficiently large to trigger the allocation of 1% of those losses to the banks, or even so large as to trigger the allocation of 100% of those losses to the banks. Because losses allocated to the banks in those scenarios were not covered by the Class A Guaranteed Payment, the district court found that "the Dutch Banks' return on their capital investment (and risk of loss) was tied to the availability of partnership capital." *Id.*

The court also concluded that, even if its ruling that the banks qualified as partners under § 704(e) was ultimately overturned, the government could not impose a penalty pursuant to I.R.C. § 6662(d) on the taxpayer for substantial understatement of income or negligent underpayment of tax in the years 1997 and 1998 because "substantial authority" supported the treatment of the banks' interest as equity for tax purposes.[2] *Id.* at 396-399.

---

[2] The parties agree that the issue of penalties relating to the tax years 1993 through 1996 are properly resolved at separate partner-level proceedings. *See TIFD III-E*, 660 F. Supp. 2d at 395.

*Discussion*

We appreciate and have benefitted from the District Court's conscientious, thoughtful and comprehensive analysis on remand. Ultimately, however, the issue whether the term "capital interest" in § 704(e)(1) includes an interest that is overwhelmingly in the nature of debt is one of law, which of course we review *de novo*. We respectfully disagree with the district court's analysis. As we now review the question arising under § 704(e)(1), we conclude that the same evidence which, on our last review, compelled the conclusion that the banks' interest was so markedly in the nature of debt that it does not qualify as bona fide equity participation also compels the conclusion that the banks' interest was not a capital interest under § 704(e)(1).

A.    *The Banks' Status Under § 704(e)(1)*

From the fact that we remanded to the district court to consider in the first instance the taxpayer's contention based on § 704(e)(1), the district court inferred that we were implicitly hinting that the contention had merit. We intended no such implication. Indeed, we had made no evaluation of the issues that might arise under § 704(e)(1). We were merely following an appellate court's conventional and salutary preference for addressing issues after they have been considered by the court of first instance. The practice is often helpful because it gives the appellate court the benefit of the district court's analysis—not to mention that in many instances resolution of a new question requires fact finding. Upon now examining the question posed under § 704(e)(1) with the benefit of the district court's prior analysis, we conclude that the banks' investment did not qualify for tax treatment as a capital interest. As it turns out, this is for essentially the same reasons as compelled our earlier conclusion that the banks' interest was not bona fide equity participation.

Our previous ruling was essentially to the effect that, because a holding of partnership debt does not qualify as a partnership participation and the banks' interest in the partnership was overwhelmingly in the nature of debt, they did not qualify for tax purposes as partners in Castle Harbour. The argument that the banks nevertheless qualify as partners under § 704(e)(1) implicitly assumes that after passage of this section, debt could qualify as a partnership interest. We believe the passage of § 704(e)(1) made no such change in the law.

Section 704(e)(1) provides:

> A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

I.R.C. § 704(e)(1). For the purposes of the section, the Treasury regulations define a "capital interest" as

> an interest in the assets of the partnership, which is distributable to the owner of the capital interest upon his withdrawal from the partnership or upon liquidation of the partnership.

Treas. Reg. § 1.704-1(e)(1)(v).

We previously determined that the banks' interest was "overwhelmingly in the nature of an secured lender's interest," *TIFD III-E*, 459 F.3d at 231, and therefore did not qualify as equity participation in the partnership. Therefore, the question that arises under § 704(e)(1) is whether the passage of that section, which recognizes as a partner one who owns a "capital interest in a partnership," changed the law so that a holding of debt (or of an interest overwhelmingly in the nature of debt) could qualify as a partnership interest. We conclude upon examination of the statute, the regulation, and pertinent interpretive materials that § 704(e)(1) did not so change the law.

12

The question is whether the term "capital interest in a partnership" was intended to, and does, include a holding of debt. Our first reference must be to the terms of the statute and regulations to determine whether a literal reading provides an unambiguous answer. We conclude that it does not. The terms "capital" or "capital interest" are reasonably subject to multiple interpretations. However, the ambiguity as to whether the term "capital interest" includes a debt-holder's interest distinctly favors the government's position that the banks' interest, which is overwhelmingly in the nature of debt, does not qualify as partnership interest under § 704(e)(1).

Our consultation of various dictionaries, both specialized in the area of finance and general, reveals that, while the word "capital" can be used to refer to a firm's available resources regardless of whether they represent equity or debt, the more favored usage refers to an ownership, or equity, interest. *See, e.g.*, Joel G. Siegel & Jae K. Shim, *Dictionary of Accounting Terms* 62 (3d ed. 2000) (defining "capital" as "1. equity interest of the owner in the business that is the difference between ASSETS and LIABILITIES, also called EQUITY or NET WORTH").[3] The word "interest" is also commonly used to mean "equity ownership . . . in a business or property." *See id.* at 232; *see also Webster's Third New International Dictionary* 1178 (1976)

---

[3] In other dictionaries we have consulted as well, the more favored meaning indicates equity interest in a firm. For example, Webster's New Third International Dictionary first offers as a preferred meaning equity interest in a firm, and only thereafter offers as a secondary meaning "available money." *See Webster's Third New International Dictionary* 332 (1976) (defining "capital" as "1.e: the proprietary claim in a business . . . g: NET ASSETS: excess of assets over liabilities . . . k. available money"). Another offered definition, "1.f: the principal of a loan as contrasted with interest," is not relevant to our inquiry as it refers not to the question whether a firm's "capital" includes its debt as well as its equity, but rather to a terminology for distinguishing *in the case of a debt* between the portion representing principal and the portion representing interest. According to the Oxford English Dictionary, a "capital stock or fund" may refer to the equity portion of a firm's resources. *See Oxford English Dictionary*, www.oed.com (defining "capital stock or fund" as "the total sum of the contributions of the shareholders").

13

(defining "interest" as "1b: something in which one has a share of ownership or control: BUSINESS").[4]

The pertinent regulation, § 1.704-1(e)(1)(v), similarly tends to favor the government, while perhaps leaving the matter ambiguous. As noted, the regulation states that a "capital interest" is "an interest in the assets of the partnership." According to common understanding, a holder of a firm's debt does not own an interest in the firm's assets. To be sure, the holder of a firm's debt, as a creditor, has a claim to be paid out of the firm's general assets. But, absent a contractually negotiated right, the holder of the firm's debt has no right even to be consulted as to whether or how the firm disposes of its assets. Furthermore, so long as the partnership has resources dependably sufficient to pay the debt, the value of the creditor's interest does not rise and fall with the value of the partnership's assets.

Notwithstanding that they tend to favor the government's position, the governing statute and regulation leave some ambiguity as to whether the holder of partnership debt (or an interest overwhelmingly in the nature of debt) shall be recognized as a partner. Therefore, we may consult the legislative history to see whether it sheds light on their interpretation. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 770-71 (2d Cir. 2010) ("[W]hile our analysis begins with the statutory text itself, where we find ambiguity we may delve into other sources, including the legislative history, to discern Congress's meaning."). The reports of the House and the Senate accompanying the passage of § 704(e) make clear that the provision did not intend to broaden

---

[4] Of course, interest is also sometimes used to indicate simply a share in a business enterprise, either as an equityholder or a debtholder. *See Oxford English Dictionary*, www.oed.com (defining "interest" as "[a] pecuniary share or stake in, or claim upon anything; the relation of being a part-owner of property, a shareholder or bondholder in a commercial or financial undertaking").

14

the character of interests in partnerships that qualify for treatment as a partnership interest to include partnership debt.

The purpose of the statute was to address an altogether different question. The concern of § 704(e)(1) was whether it matters, for the determination of whether a person is a partner for tax purposes, that the person's purported partnership interest arose through an intrafamily transfer. The section was passed to reject court opinions that refused to recognize for tax purposes transfers of partnership interests because the transfers were effectuated by intrafamilial gift, as opposed to arm's length purchase.[5] Its focus is not on the nature of the investment in a partnership, but rather on who should be recognized for tax purposes as the owner of the interest.

Thus, the legislative reports accompanying passage of the statute do not discuss at all whether different types of interests (debt as opposed to equity) will qualify as a capital interest. They do not suggest that the statute changed the type of interest that will qualify. Their focus is entirely on the *transfer* of an interest and whether the purported transfer effectuated a true change in ownership. The reports thus assert that the amendment was designed to "leave[] the Commissioner and the courts free to inquire in any case whether the donee or purchaser *actually owns the interest* in the partnership which the transferor purports to have given or sold him." H.R. Rep. No. 82-586 (1951) (emphasis added); S. Rep. No. 82-781 (1951) (identical language).

---

[5] The steeply graduated tax rates of the 1940's created an incentive for families to divide a single partner's interest among two or more members, so that the total income from the interest would be taxed at a lower rate. *See Comm'r v. Tower*, 327 U.S. 280, 534-35 (1946); Note, *Family Partnerships and the Revenue Act of 1951*, 61 Yale L.J. 541, 541-43 (1952). The legislative reports accompanying passage of what is now codified as § 704(e) expressly disapproved of the Tax Court's frequent rejection of such transfers. *See* H.R. Rep. No. 82-586 (1951) (noting "the frequency with which the Tax Court . . . has held invalid family partnerships based upon donations of capital," and stating that the amendment "makes it clear that, however the owner of a partnership interest may have acquired such interest, the income is taxable to the owner, if he is the real owner"); S. Rep. No. 82-781 (1951) (identical language).

15

The reports of the House and Senate made clear that "[a]ll the facts and circumstances . . . may be taken into consideration in determining the bona fides or lack of bona fides of a purported gift or sale," and that "where there is a real transfer of ownership, a gift of a family partnership interest is to be respected for tax purposes without regard to the motives which actuated the transfer." H.R. Rep. No. 82-586 (1951); S. Rep. No. 82-781 (1951) (identical language). Nothing in the reports suggests any intention that the amendment alter the eligibility of a holding of partnership debt to be deemed a partnership interest.[6]

Nor has litigation under the section addressed the question whether its passage changed the type of interest that qualifies as a partnership interest. The cases have focused, appropriately, on the purpose of the provision – to dispel any relevance of the fact that a partnership interest, concededly in the nature of equity, arose from a gift, in determining whether a purported transferee of an interest is in fact its true owner for tax purposes. *See, e.g.*, *Bateman v. United States*, 490 F.2d 549, 553 (9th Cir. 1973); *Evans v. Comm'r*, 447 F.2d 547, 549-52 (7th Cir. 1971); *Pflugradt v. United States*, 310 F.2d 412, 415-17 (7th Cir. 1962); *Estate of Winkler v. Comm'r.*, 73 T.C.M. (CCH) 1657 (1997); *Elrod v. Comm'r*, 87 T.C. 1046, 1072-75 (1986); *Garcia v. Comm'r*, 48 T.C.M. (CCH) 425 (1984); *Cirelli v. Comm'r*, 82 T.C. 335, 344-48 (1984); *Manuel v. Comm'r*, 45 T.C.M. (CCH) 981 (1983); *Fiore v. Comm'r*, 39 T.C.M. (CCH) 64 (1979); *Ketter v. Comm'r*, 70 T.C. 637, 647-50 (1978); *Buehner v. Comm'r*, 65 T.C. 723,

_____

[6] The limited purpose is reflected in the title given to § 704(e) – "Family partnerships" – and to § 704(e)(1) – "Recognition of interest created by purchase or gift." It is further reflected in the other two subsections of § 704(e), which apply only to partnership interests created by gift. *See* § 704(e)(2) (requiring that the distributive share of the donee under the partnership agreement be includible in the donee's gross income, except to the extent that the share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor); § 704(e)(3) (deeming transfer of a partnership interest by intrafamilial purchase to be transfer by gift).

16

744-47 (1976); *Krause v. Comm'r*, 57 T.C. 890, 897 (1972); *Woodbury v. Comm'r*, 49 T.C. 180, 191-95 (1967); *Tiberti v. Comm'r*, 21 T.C.M. (CCH) 961 (1962). None of the decisions suggest in any way that § 704(e)(1) should be construed as drastically altering the pre-existing law of partnership taxation by allowing an interest properly characterized as debt to be recognized as a partnership interest.

We do not understand either the district court, or for that matter the taxpayer, to argue otherwise. The district court's analysis was not that § 704(e)(1) changed the law to allow debt to be considered a partnership interest, but rather that the banks' interest should be deemed to be in the nature of equity, and thus a "capital interest" for the purpose of § 704(e)(1), because the banks' return could vary with the performance of the partnership.

The district court found that the banks incurred what it characterized as "real risk" that their capital accounts, as defined by the partnership agreement, would be negative upon dissolution, requiring them to restore the deficit. *Id.* at 391. The court acknowledged that the Class A Guaranteed Payment, to which the banks were entitled if the value of their Investment Accounts exceeded the value of their capital accounts upon liquidation, ensured that the banks would receive a return at the Applicable Rate even if the partnership suffered losses of up to $7 million. *Id.* The court, however, found significant that the banks were not completely insured against a return below the Applicable Rate because the partnership agreement allocated to their capital accounts 1% of partnership losses exceeding $7 million and 100% of partnership losses exceeding $541 million, and those losses were not covered by the Class A Guaranteed Payment. *Id.* at 391-92. If the partnership suffered losses of that magnitude, depleting some or all of its assets, the banks' return would fall below the Applicable Rate.

17

Because the payout to the banks upon liquidation of the partnership was thus linked, in some degree, to the value of the banks' capital accounts, and because the value of those accounts was in turn linked, in some degree, to the value of Castle Harbour's assets, the court reasoned that the payout to the banks upon liquidation was "tied to the availability of partnership capital." *Id*. at 391. The court concluded that the banks' interest was therefore an "interest in the assets of the partnership" distributable to them upon liquidation. Treas. Reg. § 1.704-1(e)(1)(v); *see TIFD III-E*, 660 F. Supp. 2d at 392. The district court's finding that the banks' interest qualified as a capital interest was thus premised entirely on the significance it accorded to the possibility that the banks would be required to bear 1% of partnership losses exceeding $7 million, or 100% of partnership losses exceeding $541 million.

We respectfully disagree. The "risks" in question were in the nature of *appearance* of risk, rather than *real* risk. The risks do not justify treating the banks' interest as a capital, or equity, interest. We considered both in our previous opinion. As to the first risk - that partnership losses would be large enough to trigger the 1% allocation – the district court had itself found in its earlier opinion that this risk was "minimal," *see TIFD III-E*, 342 F. Supp. 2d at 106, and we agreed, *see TIFD III-E*, 459 F.3d at 228 n.5. Because the fraction of loss to be allocated to the banks was so small, even significant partnership losses would have caused only a tiny deviation from the Applicable Rate of return in all but the most improbable scenarios. As to the second – that partnership losses would be large enough to trigger the 100% allocation – we endorsed the district court's conclusion in its initial opinion that the risk was "not relevant" because it was so unlikely to materialize. *See TIFD III-E*, 342 F. Supp. 2d at 101 n.16; 459 F.3d at 229 n.7.

18

In its decision following remand, the district court did not suggest that it, or we, had underestimated the significance of these risks. Rather, it concluded that the banks' overall downside risk, although "minimal," was "still possible, and therefore not meaningless." *TIFD III-E*, 660 F. Supp. 2d at 381. In our prior opinion, however, we explicitly considered the extent of the banks' downside risk and concluded that they "incurred no meaningful downside risk." *TIFD III-E*, 459 F.3d at 228; *see also id.* at 233 ("[T]he banks ran no meaningful risk of being paid anything less than the reimbursement of their investment at the Applicable Rate of return."). The district court's new conclusion that the banks' downside risk was "not meaningless" was squarely at odds with our previous ruling. Our conclusion that the banks ran no meaningful risk of a return below the Applicable Rate (together with our conclusion that they enjoyed no meaningful prospect of a return above the Applicable Rate) was a part of our holding, as this conclusion was essential to our ruling that their interest was not a bona fide equity interest.[7]

_____

[7] In its opinion on remand, the district court acknowledged that we had concluded that the banks' return was effectively capped at the Applicable Rate, but stated that we had not considered the question of the banks' exposure to loss. This was not correct. We expressly stated that the banks' interest was not bona fide equity as a matter of law because it carried a legally insignificant possibility of a return either above *or below* the Applicable Rate. *See* 459 F.3d at 240 ("[T]he banks were, for all intents and purposes, secured creditors."); *see also id.* at 226 ("The scheduled reimbursement of the Dutch banks, at the Applicable Rate of annual return, was in no way dependent on partnership performance."); *id.* at 227 ("[T]he banks did not meaningfully share in the business risks of the partnership venture . . . ."); *id.* at 228 ("[R]eimbursement at a minimum rate of the Applicable Rate of return was assured independent of the operating results of the partnership."); *id.* ("[T]here was no realistic chance that the Dutch banks would receive less than the reimbursement of their initial investment at the Applicable Rate of annual return."); *id.* at 236 ("The banks . . . received a secure guaranty of the reimbursement of their investment at the agreed Applicable Rate of return."); *id.* at 237-38 ("[T]he banks were protected against any meaningful diminution of . . . repayment [at the Applicable Rate of return]."); *id.* at 239-40 ("[F]eatures of the Castle Harbour agreements combined to provide the Dutch banks with . . . an ironclad assurance that they would receive

19

The district court was perhaps reading § 704(e)(1) to mean that the addition to a debt interest of any possibility that the holder's ultimate entitlement will vary, based on the debtor's performance, from pure reimbursement plus a previously fixed rate of return will qualify that interest as a partnership interest, no matter how economically insignificant the potential deviation and how improbable its occurrence. We disagree with any such reading of the statute. No such interpretation is compelled by the plain language of § 704(e)(1). And the fact that the statute was intended to serve an altogether different purpose is confirmed by the legislative reports.

In explaining our conclusion that the banks' interest was not a genuine equity interest, we repeatedly emphasized that, as a practical matter, the structure of the partnership agreement confined the banks' return to the Applicable Rate regardless of the performance of Castle Harbour. *See* 459 F.3d at 231 ("The banks had no meaningful stake in the success or failure of Castle Harbour."); *id.* at 239 ("[T]he mechanisms of the partnership agreements ensured that the Dutch banks would receive precisely . . . an annual return at the Applicable Rate, regardless whether Castle Harbour was experiencing profits or losses."). We found that the partnership agreement's effective decoupling of the banks' rate of return from the value of Castle Harbour's assets compelled the conclusion that the banks' interest "was overwhelmingly in the nature of a secured lender's interest, which would neither be harmed by poor performance of the partnership nor significantly enhanced by extraordinary profits." *Id.* at 231.

---

repayment of their principal at the Applicable Rate of return, regardless of the success of the Castle Harbour venture.").

The banks' interest was therefore necessarily not a "capital interest," which is "an interest in the *assets* of the partnership . . . distributable to the owner . . . upon withdrawal . . . or liquidation." Treas. Reg. § 1.704-1(e)(1)(v) (emphasis added). Because the banks' interest was for all practical purposes a fixed obligation, requiring reimbursement of their investment at a set rate of return in all but the most unlikely of scenarios, their interest rather represented a *liability* of the partnership. Moreover, in our prior opinion, we specifically distinguished the banks' right to force repayment of their investment at the Applicable Rate upon their withdrawal from Castle Harbour from a partner's typical right to force a buyout of her share, giving account to the profits gained and losses suffered during her participation, noting that the banks' right was characteristic of debt, not equity. *See* 459 F.3d at 238 ("The position of the Dutch banks was thus very different from an ordinary equity partner's ability to force liquidation of a partnership.") Accordingly, for the same reasons that the evidence compels the conclusion that the banks' interest was not bona fide equity participation, it also compels the conclusion that their interest was not a capital interest within the meaning of § 704(e)(1).[8]

---

[8] The taxpayer argues that the banks' interest may qualify as a capital interest under § 704(e)(1) despite failing to qualify as bona fide equity participation under *Culbertson*'s totality-of-the-circumstances test because the *Culbertson* test is ultimately focused on the parties' intent, while the § 704(e)(1) inquiry is limited to an assessment of the objective nature of the interest. *See Culbertson*, 337 U.S. at 742 ("The question is . . . whether, considering all of the facts – the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent – the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.").
    Even assuming, however, that there may be circumstances in which the application of *Culbertson* and § 704(e)(1) yields different results as to whether the purported holder of a partnership interest qualifies as a partner, we see no reason why the results should differ in this case. In our prior opinion, we ruled that the objective facts of the structure that the parties had created (and intended to create) indicated that the banks' interest was "overwhelmingly in the nature of a secured lender's interest," and therefore required that the banks' interest be treated as

21

B.    *Penalties*

I.R.C § 6662 authorizes the imposition of a penalty equal to 20 percent of a substantial understatement of tax.  A taxpayer may avoid the penalty by demonstrating substantial authority for the taxpayer's treatment, which resulted in the understatement.  § 6662(d)(2)(B)(i). Substantial authority exists "if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment."[9]  Treas. Reg. § 1.6662-4(d)(3)(i).  The standard is "less stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard."  § 1.6662-4(d)(2); *see also* § 1.6662-3(b)(3) (describing the reasonable basis standard as "significantly higher than not frivolous or not patently improper" and "not satisfied by a return position that is merely arguable").

The government argues that the taxpayer is subject to a penalty for substantial understatement of income for the years 1997 and 1998 because it has not demonstrated

---

debt for tax purpose, regardless of the parties' desire to have it treated as equity.  *TIFD III-E*, 459 F.3d at 231; *see id.* at 232 ("Th[e] [*Culbertson*] test turns on the fair, objective characterization of the interest in question upon consideration of all the circumstances."); *id.* at 238-39 (finding the taxpayer's characterization of the banks' interest as equity and the banks' own characterization of their interest as debt to be at best an "equivocal" factor in determining the proper tax classification of the interest).  Applying *Culbertson*, we thus found that the taxpayer's claimed subjective intent was insufficient to defeat the plain objective facts.  And we rely on largely the same objective factors in concluding that the banks' interest is not a "capital interest" for the purpose of § 704(e)(1).  Accordingly, even if the taxpayer is correct that the tests of partner status under *Culbertson* and § 704(e)(1) conceivably yield different results in some circumstances, that possibility has no bearing on this case.

[9] The existence of substantial authority is assessed as of the date the contested return was filed or the last day of the taxable year to which the contested return relates.  Treas. Reg. § 1.6662-4(d)(3)(iv)(C).

22

substantial authority for treating the banks as partners in Castle Harbour for tax purposes. We agree. The district court found otherwise because it mistakenly concluded that several of our decisions supported treatment of the banks as partners in Castle Harbour.

The district court believed its conclusion was justified by the fact that we recognized in *Commissioner v. O.P.P. Holding Corp.*, 76 F.2d 11 (2d Cir. 1935), and *Jewel Tea Co. v. United States*, 90 F.2d 451 (2d Cir. 1937), that interests bearing some debt-like features, such as preferred stock, may nonetheless be treated as equity for tax purposes. We have no quarrel with that proposition. *See Jewel Tea*, 90 F.2d at 452-53 ("[T]he test cannot be merely the name given to the security. Conceivably there may be preferred shares going by the name of bonds, and bonds going by the name of preferred shares. It is not always easy to tell which are which . . . ." (internal citation omitted)). But neither case supports treating as equity an interest that is "overwhelmingly in the nature of a secured lender's interest," as we found the banks' interest to be, *TIFD III-E*, 459 F.3d at 231.

In *O.P.P.*, we held that a purported debenture was properly treated as debt for tax purposes because the holder's interest consisted of an entitlement to "be paid a definite sum at a fixed time." 76 F.2d at 12. This, we explained, established the holder as a creditor, not a shareholder, because a creditor "in compensation for not sharing the profits, is to be paid independently of the risk of success." *Id.* In *Jewel Tea*, we ruled that purported preferred shares, unlike the debentures in *O.P.P.*, were properly treated as equity for tax purposes because at no time could the holders demand their money; "they were at the mercy of the company's fortunes and payment was merely a way of distributing profits." 90 F.2d at 453. In contrast to the holders of the preferred shares in *Jewel Tea*, the banks in the instant case were effectively promised recovery of their principal investment at a set rate of return, payable on a set schedule.

23

Of course, the banks' return was not *completely* divorced from Castle Harbour's performance. But, as we have explained, because those aspects of the banks' promised return that depended on Castle Harbour's performance were so unlikely to result in the banks' receipt of a return that meaningfully deviated from the Applicable Rate, the banks were in no real sense co-venturers in the partnership's fortunes. The banks' interest is thus readily distinguishable from the preferred shares at issue in *Jewel Tea*, and is properly treated as debt under the test of *O.P.P.* Those cases provide no support for the taxpayer's treatment of the banks' interest as equity participation.

The district court ruled that the taxpayer's treatment was also supported by cases holding that, if a partnership has a valid business purpose, interests held by ostensible partners in the partnership are properly classified as equity for tax purposes. *TIFD III-E*, 660 F. Supp. 2d at 397. As examples of such decisions, the court identified *Dyer v. Commissioner*, 211 F.2d 500 (2d Cir. 1954), and *Slifka v. Commissioner*, 182 F.2d 345 (2d Cir. 1950). Neither case, however, stands for that proposition. In *Dyer*, the Tax Court ruled that the taxpayers had not in fact acquired participation interests in a joint venture because they had not paid for the interests, either with cash or services. 211 F.2d at 504. We reversed not because the joint venture had a valid business purposes – that was not at issue – but because the taxpayers had contributed "something substantial" in exchange for their interests by assuming "a real and substantial risk of loss." *Id.* In *Slifka*, a one-paragraph per curiam opinion, we merely affirmed as not clearly erroneous a Tax Court finding that a joint venture did not qualify as a partnership for tax purposes because tax avoidance was the sole motive for its creation. 182 F.3d at 346. Neither *Dyer* nor *Slifka* provides authority for the proposition that a purported equity interest in a partnership is properly treated as equity for tax purposes, regardless of how pervasively it carries the features of debt, so long as the partnership has a valid business purpose. We are not aware

24

of, and the taxpayer has not identified, any decisions that support this proposition.

The taxpayer has failed to point to substantial authority supporting its treatment of the banks as partners. We find that a penalty for substantial understatement of income was therefore properly assessed.[10]

## Conclusion

The judgment of the district court is reversed.

---

[10] Our conclusion that a substantial understatement penalty is properly imposed on the taxpayer makes it unnecessary for us to consider whether the district court correctly determined that (1) Castle Harbour was not a tax shelter, *see* § 6662(d)(2)(C) (1993) (providing that the substantial authority defense is unavailable with respect to items attributable to a tax shelter); and (2) that the taxpayer is not subject to a negligence penalty, *see* Treas. Reg. § 1.6662-2(c) (barring imposition of a negligence penalty in addition to a substantial understatement penalty for the same understatement of tax).